# NO. 12-13-00179-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *KEVIN BLAIR,*<br>*APPELLANT* | § | *APPEAL FROM THE 7TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Kevin Blair appeals his conviction for stalking. In one issue on appeal, Appellant challenges the legal sufficiency of the evidence to support his conviction. We affirm.

## BACKGROUND

Appellant was charged by indictment with stalking, a second degree felony. Appellant pleaded "not guilty," and the case proceeded to a jury trial. At the conclusion of the trial, the jury found Appellant guilty of stalking as charged in the indictment, and assessed his punishment at twenty years of imprisonment and a $10,000.00 fine. This appeal followed.

## LEGAL SUFFICIENCY

In his sole issue on appeal, Appellant argues that the evidence is legally insufficient to support his conviction.

### Standard of Review and Applicable Law

In Texas, the *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the state is required to prove beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). The relevant question is whether, after viewing

the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). This standard gives full play to the responsibility of the trier of fact to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Padilla v. State*, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010).

When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct and circumstantial evidence are treated equally. *Id.* Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). A conclusion of guilt can rest on the combined and cumulative force of all the incriminating circumstances. *Hernandez v. State*, 190 S.W.3d 856, 864 (Tex. App.—Corpus Christi 2006, no pet.).

A person commits the offense of stalking if the person, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that (1) the actor knows or reasonably believes the other person will regard as threatening bodily injury or death for the other person, (2) causes the other person to be placed in fear of bodily injury or death, and (3) would cause a reasonable person to fear bodily injury or death for herself. *See* TEX. PENAL CODE ANN. § 42.072(a)(1)(A), (2), (3)(A) (West 2011 & Supp. 2013). A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. TEX. PENAL CODE ANN. § 6.03(b) (West 2011). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* Proof of a culpable mental state invariably depends on circumstantial evidence and may be inferred from any facts tending to prove its existence, including the acts, words, and conduct of the accused. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Pomier v. State*, 326 S.W.3d 373, 381 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

**Analysis**

In this case, Appellant contends only that the evidence is legally insufficient to establish that he knew or reasonably believed the victim would regard his conduct as threatening bodily injury or death for her. The evidence shows that Lydia Pedraza lived next door to Appellant's aunt and that Appellant lived in the house on the other side of his aunt. In 2006, Appellant's nephew and Appellant approached Pedraza as she was cleaning her car. Appellant's nephew said that he wanted her to meet Appellant. He also told her that Appellant wanted her telephone number and wanted to get to know her. Pedraza told them that she was not interested and that she had a boyfriend. At that point, Appellant and his nephew left. The next day when Pedraza returned home from work, she discovered a letter from Appellant on her door. He stated that he wanted to get to know her and take her out, and that he "wanted [her] to be [his] boo." Pedraza called law enforcement and purchased an alarm for her house.

Pedraza testified that beginning in February 2012, when she left her house for work, Appellant stood on the other side of the fence separating her house from his aunt's house, facing her, and wanting to talk to her. He was in the same place waiting for her every day when she returned from work. She stated that she received telephone calls, texts, and emails from Appellant as she walked into her house. Pedraza described the area near the fence as formerly covered with brush, shrubs, or trees. Eventually, she said, a portion of the area was cleared where Appellant stood or sat and watched her. According to Pedraza, Appellant had a "clear shot" to see her coming and going from her house. She realized then that she was being watched, and became afraid because she lived alone.

Pedraza decided to call law enforcement because she wanted the text messages and telephone calls from Appellant to stop. Pedraza informed the Smith County sheriff's deputy who responded to her call on February 21, 2012, that she lived alone and was afraid. The deputy testified that Pedraza was scared for her safety and "kind of a little hysterical." She told the deputy that Appellant kept calling her "nonstop" and texting her. He said that while he was at Pedraza's house, Appellant called her two or three times. The deputy spoke with Appellant and told him not to call her. After meeting with Appellant, the deputy told him to stay away from Pedraza and to stop calling or texting her.

Pedraza stated that she ignored most of the texts and telephone calls from Appellant from February to June 2012. However, in one text exchange with Appellant in May 2012, Appellant

3

texted her that Jesus had appeared to him in a dream and told him that he needed a Christian wife. He asked if she was the one that God was speaking of, stated that he would be at church that night, and asked if they could read the Bible and pray together. Pedraza responded by telling him to leave her alone and not to text or call her "ever." He responded by telling her that she would never hear from him again. Records from Verizon Wireless showed that from February 1, 2012, through July 1, 2012, Appellant made approximately one hundred twenty-three calls to Pedraza's telephone number, including twenty-three calls between February 18 and 21; eight calls between May 14 and 15; and nine calls on May 20. The records also showed that Appellant texted Pedraza approximately sixty-five times from February 1, 2012, through May 4, 2012.

Pedraza testified that she saw Appellant when he came to her church. She received a text message from Appellant informing her that he wanted to come to church, go home with her afterwards, and study the Bible with her. She informed members of her church what had occurred. Two of her church friends, one a former police officer, testified that Appellant showed up at their church in 2012. One of them testified that Appellant was "very" adamant about having a Bible study with Pedraza and that the friend was "pretty plain" that it was not going to happen. The other church friend, the former police officer, explained to Appellant that his actions were illegal, that he was stalking Pedraza, and that it would not be allowed in the church. He also told Appellant that he was not going to be allowed to confront her or talk to her. However, Appellant came back to the church two or three times. The former police officer testified that both times, he repeated what he had told Appellant during their first confrontation. He said that both times, Appellant stated that he needed to talk to Pedraza.

On June 15, 2012, Appellant contacted the Smith County sheriff's office to report that he had heard some glass breaking. Appellant told the deputy who responded that he went to the side of the house and saw two individuals running from the back of his neighbor's residence. He told the deputy that his neighbor, Pedraza, had been gone approximately five days. The deputy found a broken window behind the residence and attempted to contact Pedraza, but was unable to do so.

At that time, Pedraza had been at a church retreat in Kentucky for a week. When she returned on June 16, she discovered the middle room in her home had been broken into and she contacted law enforcement. She believed that Appellant had broken into her house and informed

4

the deputy who responded to her call. Later that evening, Appellant knocked on her door. Pedraza left her house and stayed with a neighbor because she was too scared to stay at her house. When she returned home to gather supplies for her weekend job, she noticed Appellant sitting in his aunt's yard watching her. Later, she observed Appellant outside the neighbor's house where she had been staying. Eventually, Pedraza moved out of her house, lived in a crisis center, sold her home, and acquired a handgun because she was scared of Appellant. At trial, she was still scared that Appellant could physically injure or kill her.

On June 18, 2012, Pedraza filed a report with the Smith County sheriff's office regarding Appellant and his actions since 2006. According to the deputy taking the report, Pedraza was "pretty concerned." Based on prior reports and information from Pedraza, the deputies investigating the matter believed that Appellant might have been the individual who entered her residence. One of the deputies testified that Pedraza was worried "to the point of almost being scared." The deputies talked to Appellant and went to the location in Appellant's back yard where he allegedly saw the two individuals leave Pedraza's house. One of the deputies testified that there was "no way" anyone could see the back window of Pedraza's house from the location Appellant described. Appellant told one of the deputies that he cared for Pedraza and that he loved her. Appellant wanted the deputy to tell Pedraza that he loved her and wanted to be with her "forever." The next day, the deputies spoke to Appellant again, and he attempted to communicate with Pedraza through the deputies during their conversation. At one point, Appellant admitted that he entered Pedraza's house because he had not seen her in a few days, and wanted to see what she was like and how she lived.

One of the deputies testified that on July 9, 2012, Appellant called him and wanted to know if he had conveyed the message to Pedraza. He told Appellant that he did, but also stated that Appellant needed to stay away from her and not have any contact with her. Jeremy Black, a detective in the major crimes division of the Smith County sheriff's office who was investigating Appellant's case, testified that Appellant contacted him by telephone on July 9, 2012. Detective Black stated that he recorded the conversation. In that conversation, Appellant denied contacting Pedraza since being told not to do so by the deputies on July 18, 2012. He also stated that he had not seen her since the burglary. However, Detective Black noted that telephone records showed Appellant called Pedraza on July 20, 2012, and that Pedraza saw him outside her car while staying at a friend's house after the burglary.

5

In summary, the evidence shows that Pedraza repeatedly asked Appellant to stop calling or texting her. She also reported Appellant's conduct to law enforcement on a number of occasions. After each report, one or more law enforcement officers told Appellant to stay away from Pedraza. Her church friends, one of whom was a former police officer, also warned Appellant several times to stop trying to call or text Pedraza. The former police officer even warned Appellant that he was stalking Pedraza and that his conduct was illegal.

Appellant's decision to ignore the requests of Pedraza and her church friends, as well as the warnings from law enforcement officers, reveals his knowledge about his conduct. *See, e.g., McGowan v. State*, 375 S.W.3d 585, 591 (Tex. App.–Houston [14th Dist.] 2012, pet. ref'd) (holding that defendant's decision to ignore warnings from stepbrother and law enforcement officers revealed his knowledge that stalking victim would regard his conduct as threatening bodily injury or death); *Allen v. State*, 218 S.W.3d 905, 909 (Tex. App.–Beaumont 2007, no pet.) (holding that jury could rationally conclude defendant's "behavior, which persisted after a police officer warned him to stop, revealed a subjective awareness that his actions had placed the complainant in fear of bodily injury"). Thus, from the evidence that Appellant continued his behavior, a rational jury could have inferred that Appellant knew or reasonably believed Pedraza would regard his conduct as threatening bodily injury or death to her. Accordingly, we conclude that the jury reasonably could have found the essential elements of stalking beyond a reasonable doubt. *See* TEX. PENAL CODE ANN. § 42.072(a)(1)(A). We overrule Appellant's sole issue.

## DISPOSITION

Having overruled Appellant's sole issue, we *affirm* the judgment of the trial court.

SAM GRIFFITH
Justice

Opinion delivered January 15, 2014.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(DO NOT PUBLISH)

6



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JANUARY 15, 2014**

**NO. 12-13-00179-CR**

**KEVIN BLAIR,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 7th District Court

of Smith County, Texas (Tr.Ct.No. 007-1255-12)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Sam Griffith, Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*