Kevin Lee ALLEN, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–06–145 CR.

Court of Appeals of Texas, Beaumont.

Submitted on Nov. 1, 2006.

Decided March 28, 2007.

Stephen Christopher Taylor, Humble, for appellant.

John S. Holleman, Crim. Dist. Atty., William Lee Hon, Asst. Crim. Dist. Atty., Livingston, for state.

Before McKEITHEN, C.J., GAULTNEY and KREGER, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

A jury convicted Kevin Lee Allen of stalking. The trial court assessed a nine year sentence as punishment. In three appellate issues, Allen challenges the legal and factual sufficiency of the evidence supporting the verdict and argues the trial court reversibly erred in admitting evidence of extraneous acts during the guilt phase of the trial. We affirm.

A legal sufficiency review requires us to view the evidence in the light most favorable to the verdict and determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Ross v. State*, 133 S.W.3d 618, 620 (Tex.Crim.App.2004). A factual sufficiency review requires that we consider all the evidence in a neutral light

to determine whether the evidence supporting the verdict is too weak to support the finding of guilt beyond a reasonable doubt, or if the evidence of guilt, although adequate if considered alone, is so greatly outweighed by contrary proof that the jury's verdict is not rationally justified. *Johnson v. State,* 23 S.W.3d 1, 11 (Tex. Crim.App.2000); *see also Watson v. State,* 204 S.W.3d 404, 417 (Tex.Crim.App.2006).

As defined in the Texas Penal Code, the offense of stalking includes both an objective component and elements from the points of view of the accused and the complainant, as follows:

(a) A person commits an offense if the person, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct, including following the other person, that:

(1) the actor knows or reasonably believes the other person will regard as threatening:

(A) bodily injury or death for the other person;

(B) bodily injury or death for a member of the other person's family or household; or

(C) that an offense will be committed against the other person's property;

(2) causes the other person or a member of the other person's family or household to be placed in fear of bodily injury or death or fear that an offense will be committed against the other person's property; and

(3) would cause a reasonable person to fear:

(A) bodily injury or death for himself or herself;

(B) bodily injury or death for a member of the person's family or household; or

(C) that an offense will be committed against the person's property.

TEX. PEN.CODE ANN. § 42.072 (Vernon 2003).

Allen and the complainant developed a pattern of separation and reconciliation during their rather short-lived romantic relationship. They began dating New Years' Eve, 2004; shortly thereafter Allen moved in with the complainant. By April they were fighting, separating, and reconciling. According to Allen, the complainant occasionally called him and answered his telephone calls, thus encouraging him to call more frequently. Allen called her hundreds of times from July 1 through July 4 of 2005. Complainant spent the night of July 4 with Allen at his parents' house. Allen was arrested July 10. We understand Allen's argument to be a challenge to the sufficiency of the evidence supporting a finding that Allen knew the complainant would regard his conduct as threatening bodily injury or death. *See* TEX. PEN.CODE ANN. § 42.072(a)(1).

Viewed in isolation, the victim's apparent willingness to be with Allen for an extended period of time might call into question her fear of bodily injury and the appellant's awareness of that fear. In the context of their relationship, however, the jury could reasonably believe that the victim spent the Fourth of July with Allen precisely because she feared him, that the appellant made the calls for the purpose of intimidating the victim into staying with him, and that the appellant's conduct included a threat of bodily injury to the complainant.

There is ample evidence that Allen engaged in a scheme or course of conduct. A telephone company representative pro-

duced records of the telephone calls made on a telephone in Allen's possession from July 1 through July 12, 2005. Although the telephone was registered to the appellant's father, Allen had exclusive use of the telephone. The victim identified her telephone number and literally hundreds of calls to that number over the space of a few days. According to the complainant, she kept her phone turned on but most of the calls went to her voicemail. The only lull in this activity was when they were visiting Allen's parents on July 4. The complainant testified that she insisted they go there instead of her home because she knew Allen would behave around his parents, and that made her feel safer. On July 6, Allen and the complainant argued about his having placed a pornography subscription on her television account. She left, but they continued to call each other. During that period of time, Allen would sit outside her home, uninvited. The complainant testified that she would call him because she was out with some friends and wanted to know where he was "so I wasn't caught in a situation."

In the early morning hours of July 10, the complainant encountered a law enforcement officer at a restaurant. The officer noticed the constant telephone calls and asked her if she would like to stop them. The officer spoke with Allen, and then advised the complainant not to go home. She went to the sheriff's department. Allen called her several more times. The complainant answered the phone and warned him to stop calling. After leaving the sheriff's department, she realized Allen was driving very closely in the vehicle directly behind her. She drove to a friend's house, got out, and ran to the front steps. Allen caught her, threw her to the ground, and took her cell phone. She called the police, who took Allen into custody. The complainant obtained a protective order. Allen called her three times

from the jail. She was with the sheriff when Allen called, and the telephone calls stopped after that; however, Allen started writing a series of letters while in custody.

The officer who spoke with Allen from the restaurant testified that Allen reacted belligerently to the suggestion that he stop calling the victim. According to the officer, Allen screamed and cursed, and also implied that his position, as a former deputy and as the son of a captain in the sheriff's department, would insulate him from negative consequences for his actions. The officer testified about telling Allen that he had been warned and he needed to leave the complainant alone. A short time later, Allen called the complainant again. When the appellant was arrested three hours later, he told the arresting officer repeatedly that he loved the complainant and he could not leave her alone.

The record contains evidence of physical violence that preceded and accompanied the pattern of telephone calls from which the jury could infer both objective and subjective awareness of a threat of bodily injury. The victim testified that Allen physically assaulted her on five separate occasions. The first assault occurred in April at her home, after an argument over mowing the lawn. Allen kicked her car, denting it, threw her keys across the parking lot, took her cell phone, and hit a picture on her wall.

The second assault occurred at an Onalaska club in May. Allen became jealous while they were out on a date. Allen followed her into the ladies' bathroom, crushed her phone, followed her outside, and pushed her against the wall. She hit him, and he slapped her face. The third incident occurred at his sister's estranged husband's home in June, after an argument over the car keys. Allen hit the complainant across the face and hit her

phone while she was making a call, then choked her. Although Allen's sister admitted an argument took place, Allen's sister and brother-in-law testified that no physical altercation took place in their presence. Later that month, Allen assaulted the complainant in her home, tore her telephones out of the wall, and punched a hole in the wall. Allen told her he was looking for a knife and stated he wanted to kill himself. She started to run out the door, but he grabbed her and threw her on the couch.

The final assault occurred on July 10 when Allen threw her to the ground outside a friend's home. According to the victim, "[t]he more the incidents occurred, the more I was—I felt like I was scared, you know, because it wouldn't stop no matter what." She claimed to have stayed with Allen as long as she did because he would be contrite once he calmed down. She testified, "As long as I would be nice to him and he knew that I was there and he had control, he was fine." She also testified that he would call her "[e]very day, sometimes every minute." If she "made everything okay" with him, "[t]he phone calls would stop." The victim denied the possibility that Allen was "getting mixed signals" from her behavior. Asked if he was threatening her, or merely trying to get her back, she replied, "He was threatening me." The victim's co-worker confirmed that the victim was "scared of [Allen]" during the periods of estrangement.

The evidence on which Allen relies centers on the victim's behavior. The complainant admitted that she both telephoned Allen and stayed with him while he was stalking her. The jury could rationally construe the victim's behavior as a defensive response to being stalked. Defense counsel argued to the jury that telephone messages for the complainant did not contain overt threats of bodily injury. However, the jury could also rationally conclude that Allen's behavior, which persisted after a police officer warned him to stop, revealed a subjective awareness that his actions had placed the complainant in fear of bodily injury. Furthermore, the jury could rationally find that a reasonable person in the position of the complainant would be in fear of bodily injury or death. Although some of the victim's behavior is arguably an illogical response to a threat, and witnesses for the appellant controverted the victim's account of one of the incidents, the evidence supporting the verdict is not so weak as to undermine our confidence in the verdict. Issues one and two are overruled.

In issue three, Allen contends the trial court erred in admitting evidence of extraneous acts in the guilt phase of the trial. *See* Tex.R. Evid. 404(b). Allen's sister, Stacy Caldwell, testified for the defense in the guilt phase of the trial. On direct, Caldwell denied that any of the physical violence described by the victim during the State's case-in-chief had actually occurred during the alleged assault in June. On cross-examination, Caldwell admitted that she had called the complainant on July 10 and asked her to give Allen another chance. The prosecutor asked, "[w]ell, if he [Allen] had not done anything wrong, what purpose would there be in asking her to give him another chance ... ?" The witness replied, "What else is there to do? I wanted my brother—my brother is a good person. He deserves to be with his son and his family." After a brief hearing outside the presence of the jury, the trial court permitted the State to ask the witness if she was aware that Allen had been charged with public intoxication after the altercation at the club in Onalaska; if she was aware that in July 2003, Allen assaulted his wife, destroyed a radio in her patrol vehicle and damaged property in their

home; and if she was aware that Allen faced criminal charges after the altercation with his former wife resulted in the issuance of a family violence protective order, which he violated three days later.[1]

Allen contends the trial court abused its discretion because the witness was testifying on cross-examination. Thus, he argues, the State relied upon its own questioning to elicit extraneous act evidence. The State may not convert a fact witness into a character witness through its own cross-examination. *Wheeler v. State*, 67 S.W.3d 879, 883 (Tex.Crim.App.2002). Here, however, the State did not inquire into collateral matters or inject character into the case. The prosecutor merely asked the witness why she had asked the victim to give the appellant another chance if, as the witness claimed, the appellant had not done anything wrong. This question neither inquired into extraneous acts nor asked about the character of the accused, and defense counsel did not object to the scope of the question. If a defense witness injects character in a non-responsive answer to a valid question on cross-examination, the State's remedy is to object and obtain an instruction to disregard the non-responsive answer. *Wiggins v. State*, 778 S.W.2d 877, 891 (Tex.App.-Dallas 1989, pet. ref'd). In this case, however, the witness's answer—that she interceded for her brother because he was a good person—was responsive to the question that had been asked. Therefore, the trial court properly overruled defense counsel's objection that the answer was non-responsive.

If a witness testifies to a defendant's good character, the State may inquire about the witness's awareness of specific instances of conduct in its cross-examination. *Drone v. State*, 906 S.W.2d 608, 616 (Tex.App.-Austin 1995, pet. ref'd). Defense counsel did not object when the prosecutor asked Caldwell if she was aware that appellant was charged with public intoxication after the Onalaska bar fight. Indeed, the complainant had already testified without objection that the police were called out to the scene, that she and Allen were taken to the police station, and that Allen "got a PI" but that no assault charges were filed. Because that incident was one of the assaults the State relied on to prove a threatening course of conduct, the charges stemming from that incident would be admissible same transaction contextual evidence. *See Pondexter v. State*, 942 S.W.2d 577, 584 (Tex.Crim.App.1996).

Defense counsel, however, objected to the prosecutor's questions regarding the witness's awareness of the appellant's violation of a protective order and assault against his wife, on grounds of relevance and extraneousness. *See* Tex.R. Evid. 401, 402, 404. At that point, however, this evidence was relevant to the issue of the defendant's good character. *See* Tex.R. Evid. 405. The State was entitled to test the witness's claim that she contacted the victim because she knew Allen was a man of good character and not because as an eyewitness to one of the assaults she knew her brother had committed a crime. Defense counsel did not object that the evidence was more prejudicial than probative. *See* Tex.R. Evid. 403.

The State cannot develop through cross-examination a collateral matter that it could not raise on direct. *Shipman v. State*, 604 S.W.2d 182, 183–84 (Tex.Crim.App.1980). In this case, Allen's

---

1. Evidence regarding the appellant's July 2003 judgment and community supervision order for intoxication manslaughter was admitted into evidence only in the punishment phase of the trial, and is not at issue in this appeal.

defense relied on the theory that Allen failed to realize his conduct placed the complainant in fear of serious bodily injury. In connection with this theory, defense counsel asked the victim whether it was possible that Allen was "getting mixed signals" from the calls she made to him to determine his location. Counsel argued to the jury that the evidence did not show stalking, but only a breakup of a relationship that did not go smoothly. Counsel argued that Allen's phone calls and messages were not threats but mere pleas for the complainant to continue their relationship, that the assaults were merely fights, and that the victim did not become scared until after the protective order issued and Allen had been jailed. Allen's letter-writing campaign from the jail was, according to the defense, "after the fact" and "not stalking." The evidence that similar behavior in his previous relationship had resulted in a protective order and criminal charges was relevant to refute Allen's claim that he was oblivious to the possibility that the object of his affections would perceive this sort of attention as threats and be placed in fear. *See Martin v. State,* 173 S.W.3d 463, 465, 468 (Tex.Crim.App.2005)("doctrine of chances" applied when consent was an issue in a prosecution for sexual assault); *Plante v. State,* 692 S.W.2d 487, 490–92 (Tex.Crim.App.1985)(similar extraneous conduct was relevant to prove intent in prosecution for theft by deception). Because the State could have developed testimony regarding the extraneous acts of conduct in its case-in-chief, the trial court did not err in permitting the State to develop this testimony in its cross-examination of a defense witness. Issue three is overruled. The judgment is affirmed.

AFFIRMED.