Buddy Wayne WEBB, Appellant

v.

Lori Beth SCHLAGAL, Appellee

No. 11-14-00101-CV

Court of Appeals of Texas, Eastland.

Opinion filed August 31, 2017

Laura Nodolf, District Attorney, Eric Kalenak, Assistant, for Appellee.

Lane Haygood, Odessa, Ashlie Thomas Vieira, C. Luke Gunnstaks, Plano, for Appellant.

Panel consists of: Wright, C.J., Willson, J., and Bailey, J.

## OPINION

MIKE WILLSON, JUSTICE

Buddy Wayne Webb appeals the trial court's lifetime protective order that enjoined him from any contact or communication with his ex-wife, Lori Beth Schlagal,

and her minor daughter. The Midland County district attorney alleged in the application for a protective order that Webb had engaged in a course of conduct that constituted stalking, as defined by Section 42.072 of the Texas Penal Code.[1] Webb asserts five issues on appeal. We affirm.

## I. Background Facts

Schlagal and Webb, after a brief courtship, married in September 2011. The two separated three months later and divorced in March 2012. Although Webb was the petitioner in the divorce case, Schlagal testified that she separated from him because she "felt [her] life was in jeopardy." Schlagal said that Webb was "very delusional, and he believed that I was a part of a conspiracy against him."

### A. Marital Discord

Schlagal claimed that, during their marriage, Webb routinely locked the two of them in a room and interrogated her. On one occasion in December 2011, Webb locked himself and Schlagal in a room and asked her "who the pimps, the tricks and the drug dealers were that were breaking into his home." Webb believed that a "prostitution ring" operated in and around his house. Webb had a theory that "possibly there's a tunnel that comes under my house that goes up through these pathways that" lead into the attic. Webb testified that the tunnel and pathways provided a transportation system for the "prostitution ring." Webb questioned Schlagal about her involvement in the prostitution ring.

Webb claimed that his do-it-yourself, home-security system, which included Home Depot motion detectors, Samsung cameras, and a Vivint security system, alerted him to the presence of intruders. He believed that intruders gained access to his home through tunnels, pathways, or a basement. Webb conceded that his house had no basement. He also acknowledged that people could not go through four-inch walls to get to the attic, but nonetheless, he believed that the tunnels provided pathways to the attic.

On another occasion during their marriage, Schlagal called the police after Webb came home screaming and asking her where his gun was. The police reported to the scene and placed Webb in their police car, but they released him after he agreed to leave the premises. When asked if Webb had threatened to kill or hurt her on this occasion, Schlagal acknowledged that "[a]t the time [Webb] didn't make a direct threat to me, no." Webb also thought Schlagal was having an affair with a sex doctor in Dallas after he had gone

---

1. TEX. CODE CRIM. PROC. ANN. art. 7A.03 (West 2015) (issuance of protective order); TEX. PENAL CODE ANN. § 42.072 (West 2016) (stalking). Both Webb and Schlagal acknowledge that the 2011 version of the stalking statute applies in this case. We note that, effective September 1, 2013, the stalking statute was amended to allow harassing behavior to constitute an element of stalking and, by extension, the issuance of a protective order. See Act of May 24, 2013, 83rd Leg., R.S., ch. 1278, §§ 2–4, 2013 Tex. Gen. Laws 3231–32 (codified at PENAL § 42.072); see also PENAL § 42.07 (harassment) (West 2016). However, the legislature provided that the 2013 amendment, which added harassment to the stalking statute, did not apply to an offense committed prior to September 1, 2013, and that "an offense was committed before the effective date of this Act if any element of the offense occurred before that date." Act of May 24, 2013, 83rd Leg., R.S., ch. 1278, § 3, 2013 Tex. Gen. Laws 3231, 3232. Thus, when we refer to Section 42.072 in this opinion, we are referring to the statute as it existed prior to the 2013 amendment. Moreover, because the trial court did not find that Schlagal was entitled to a protective order based upon Webb's harassing behavior, the harassment portion of the 2013 version of Section 42.072 is not before us.

through her phone and phone records. Webb continued to accuse her of being part of a prostitution ring and said that her breath smelled like "semen." At the end of December 2011, Schlagal and Webb separated.

### B. Webb shoots himself in his home with a tripwire device attached to a 12-gauge shotgun.

In January 2012, Webb suffered a gunshot wound to his right ankle while in his home. Webb was hospitalized for the gunshot wound, which he initially said was an accidental shooting. Webb admitted that he kept weapons and a small amount of tear gas in the house. Later, when Detective Rosie Rodriguez of the Midland Police Department spoke to Webb in the hospital, Webb claimed that two neighborhood children had gained entry to his house through tunnels underneath his home and shot him. Webb provided Detective Rodriguez with a hand-drawn map of the tunnel and other pathways, which the State subsequently introduced into evidence. Detective Rodriguez started an investigation and went to Webb's home. She found a 12-gauge shotgun connected to a "tripwire that went across from one wall—from the south wall to the north wall" of a small hallway. After the police had used a robot to clear Webb's house of any dangers, they removed his weapons from his home, including the 12-gauge shotgun and two pistols. Detective Rodriguez characterized Webb's injury as "self-inflicted" and described him as "delusional."

### C. Schlagal alleges Webb stalks her following the divorce.

Webb testified that "the last time that I seen or talked to [Schlagal] was June or July of [2012]. So it's been a year and a half since I seen or talked to her, and as far as I know she lived in Lubbock, or still does. I don't have her phone number, you know." Schlagal corroborated this testimony from Webb. However, Schlagal explained that, after she left Webb, he continued to try to locate her through Facebook friends and by e-mailing her and others. He also threatened her family.

### D. Webb alleges Schlagal is responsible for his gunshot wound.

At some point, Webb decided that Schlagal was somehow responsible for his gunshot wound. Webb claimed that Schlagal had a relative who was a doctor who treated him for his gunshot wound and that the doctor lied when he reported that he removed shotgun wadding from the wound because Webb said he was not shot with a shotgun. Arthur Welch, Schlagal's ex-boyfriend from after the divorce, contacted Webb via private Facebook message in October 2012. Welch alleged that Schlagal had tried to have Welch killed and asked if she may have had a part in Webb being shot. Webb introduced a copy of the conversation into evidence. It read as follows:

> [Welch]: Do you think [Schlagal] had anything to do with the shooting? I dated her for a short time here in lubbock. And she threatened to have me killed.
>
> [Webb]: I feel pretty sure that [Schlagal] was in Lubbock the weekend I was shot, so I don't think she was the shooter. I absolutely believe that she knows who did though. She would've gotten the house and 1/2 million dollars IF I would've died ACCIDENTLY as it were made to look like....
>
> [Welch]: Well I think she had a lot to do with it from the things she said. And I'm so never will trust her either.
>
> [Webb]: What did she say? Did she mention any names?

This conversation with Welch prompted Webb to send two e-mails directly to

Schlagal. The first e-mail, sent in November 2012, read as follows: [2]

Lori,

I told you to call the FBI the other day because of this conversation where your ex-boyfriend told me that you were involved in the attempt on my life. If you didn't, then you are being framed. If you did, then your busted. Either way, it's in your best interest to ... [and tell] EVERYTHING that you know. It's like I told another friend of mine, 10 years is better than 30.

Furthermore, just knowing about a felony and not reporting it is a felony under federal law. Do a Google search on "Misprison of ..." information about this federal crime.

One more thing, Why didn't you mention that [ ] used to own the house around the corner?

*E. Schlagal alleges Webb continues stalking her in 2013.*

In October 2013, Webb sent Schlagal a second e-mail. The State presented this e-mail as another instance of Webb's stalking. Webb asked Schlagal in the e-mail, "What was your part in the break-ins of my house, the death of my mom [3] and the murder attempt on my life?" Webb's e-mails made Schlagal feel harassed, tormented, embarrassed, and offended, and she also feared for her life. At some point between Webb's November 2012 and October 2013 e-mails, Schlagal, acting on the advice of Detective Rodriguez, sent Webb an e-mail that demanded he cease all contact with her. Webb denied that he ever received that e-mail.

Schlagal testified that Webb had sent numerous e-mails to people and had hundreds of Facebook postings that accused her of being part of a prostitution ring, which he said was her "family" business; being involved in the break-ins in his house; being involved in his mother's death; and being part of a conspiracy to murder him. Webb acknowledged that he sent her e-mails and made Facebook postings about her and that he deleted posts, but he denied that he stalked her.

Robin Gonzalez reported to Schlagal's stepmother that Webb had posted on Facebook that he was going to kill Schlagal. Schlagal testified that Webb continued to search for her, e-mail people about her, put hundreds of posts about her on Facebook, and accuse and threaten her family. Webb sent Schlagal an e-mail insinuating that she was involved in a murder attempt on him and stating that she should contact the FBI. Schlagal reported to police that Webb would not leave her alone, and Detective Rodriguez explained that Schlagal feared for her life. Schlagal wanted the trial court "to enter a two-year protective order based upon stalking."

Webb admitted that he had called the police, Texas Rangers, FBI, and attorney general and reported that his gunshot injury was a murder attempt on his life. He also admitted that he had sent several e-mails to police about the murder attempt. In his words, "[Schlagal] would be the most obvious suspect." Webb persisted in what the police and Schlagal both described as "delusional" behavior. After a hearing where both parties testified and presented evidence, the trial court granted

---

**2.** The copy of the e-mail introduced into evidence was cut off at the right-hand margin. The ellipses in the text reflect those small portions of text that were omitted.

**3.** Webb's mother died seven weeks prior to his self-inflicted, gunshot wound. Webb testified that there were some "unanswered questions" surrounding his mother's death, and he wanted to ask Schlagal those questions.

Schlagal's application for a protective order.

## II. *Issues Presented*

Webb asserts in the first of five issues that the trial court erred when it failed to file additional findings of fact and conclusions of law. Second, he argues that the evidence was legally and factually insufficient to support the protective order. Third, he claims that the issuance of the lifetime protective order is unconstitutional as applied to him because the e-mails that he sent Schlagal constituted protected speech under the First Amendment. Fourth, Webb argues that the trial court's protective order against him unlawfully infringed on his constitutional right to bear arms. Finally, Webb argues that the trial court violated his substantive due process rights when it imposed a lifetime ban on his possession of firearms.

## III. *Analysis*

We initially outline the statutory background and the standards of review in order to address Webb's second issue that the evidence was legally and factually insufficient. Afterward, we will address Webb's third, fourth, and fifth issues and then address his first issue.

### A. *Statutory Background*

The trial court issued the protective order against Webb in accordance with Chapter 7A of the Code of Criminal Procedure.[4] The Code of Criminal Procedure grants a trial court authority to issue a protective order "without regard to the

relationship between the applicant and the alleged offender" if the applicant is a victim of certain crimes, including stalking. CRIM. PROC. art. 7A.01(a)(1) (West Supp. 2016).[5] Article 7A.01 provides that a person who is the victim of an offense under Section 42.072 of the Penal Code "may file an application for a protective order under this chapter." CRIM. PROC. art. 7A.01. A trial court "shall issue a protective order" if it finds that "there are reasonable grounds to believe that the applicant is the victim of ... stalking." CRIM. PROC. art. 7A.03. "Stalking" is a criminal offense under the Penal Code. PENAL § 42.072. A person commits the offense of stalking if the person engages in conduct that:

(1) [he] knows or reasonably believes the other person will regard as threatening:

(A) bodily injury or death for the other person;

(B) bodily injury or death for a member of the other person's family or household ...; or

. . . .

(2) causes the other person, a member of the other person's family or household, ... to be placed in fear of bodily injury or death ...; and

(3) would cause a reasonable person to fear:

(A) bodily injury or death for himself or herself; [or]

(B) bodily injury or death for a member of the person's family or household....

---

4. We note that a person can request a protective order under either the Code of Criminal Procedure or the Family Code. *See* TEX. FAM. CODE ANN. §§ 81.001, 82.002 (West 2014). The Family Code allows the trial court to issue a protective order "if the court finds that family violence has occurred and is likely to occur in the future." *Id.* § 81.001.

5. Effective September 1, 2011, the legislature amended Chapter 7A of the Code of Criminal Procedure to allow a person who is a victim of stalking to receive a protective order under that Chapter. *See* Act of May 10, 2011, 82nd Leg. R.S., ch. 135, 2011 Tex. Gen. Laws 640, 640–41 (codified at CRIM. PROC. art. 7A.01(a)(1)).

PENAL § 42.072 (2011 version). Before the trial court can enter an order, it must hold a hearing to determine "whether there are reasonable grounds to believe that the applicant is the victim of . . . stalking." CRIM. PROC. art. 7A.03(a).

### B: Issue Two: Legal and Factual Sufficiency Challenges

Webb argues that the evidence is legally and factually insufficient. On appeal, a trial court's findings of fact have the same force and effect as a jury's verdict. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). As the factfinder, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 425 (Tex. App.—Eastland 2006, no pet.). A trial court's findings of fact are reviewable for legal and factual sufficiency. *Anderson*, 806 S.W.2d at 794. Sufficiency challenges to a trial court's findings of fact are reviewed under the same standards used to review a jury's findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

### C. Standard of Review

Under a legal sufficiency standard, we consider all of the evidence in the light most favorable to the prevailing party, make every reasonable inference in that party's favor, and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *City of Houston v. Hildebrandt*, 265 S.W.3d 22, 27 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). "If there is any evidence of probative force to support the finding, i.e., more than a mere scintilla, we will overrule the issue." *Hildebrandt*, 265 S.W.3d at 27.

Under a factual sufficiency challenge, we examine all of the evidence and set aside the trial court's finding only if it is "so against the great weight and preponderance of the evidence as to be clearly wrong and unjust." *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). The factfinder is the exclusive judge of which facts have been proven, which witness is credible, and the weight to be given any witness's testimony. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 134 (Tex. 2000). We focus our analysis on (1) whether there were reasonable grounds to believe that Webb engaged in conduct that he knew or reasonably believed Schlagal would regard as threatening bodily injury or death and (2) whether Webb's conduct would cause a reasonable person to fear bodily injury or death.[6] *See* CRIM. PROC. art. 7A.03; PENAL § 42.072. As we explain below, we disagree with Webb and hold that there was both legally and factually sufficient evidence to support the imposition of the protective order.

Appellant argues that the evidence is insufficient to show that he engaged in stalking. He contends that the two e-mails did not constitute stalking, that he did not possess the culpable mental state of "knowingly" engaging in conduct that would cause Schlagal to be placed in fear of bodily injury or death, and that his conduct would not cause a reasonable person to fear bodily injury or death. Appellant is correct in that the stalking statute provides that an actor must act "knowingly." *See* PENAL § 42.072. Section 6.03 of the Penal Code provides that, "[a] person acts knowingly, or with knowledge, with respect to the nature of his conduct or to

---

6. In its findings of fact, the trial court found only that Webb "knowingly caused [Schlagal] to be placed in fear of bodily injury or death, and [Webb's] conduct would cause a reasonable person to fear bodily injury or death for himself or herself." Therefore, we will constrain our analysis to examine whether such findings are supported by the evidence.

circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." PENAL § 6.03 (West 2011).

Schlagal sent Webb an e-mail in which she demanded that he cease all contact with her. She said, "[Webb's] e-mails stopped a year and a half ago. They resumed in October." Schlagal introduced into evidence two specific e-mails from Webb. In them, Webb accused her of being involved in his shooting. Schlagal also mentioned "pages and pages of Facebook postings that have been an ongoing thing since we were together," as well as supposed "threats that are being made against my family." Schlagal explained that e-mails and Facebook postings from Webb had accused her of being part of a prostitution ring, being involved in the break-ins in his house, being involved in his mother's death, and being part of a conspiracy to murder him. In addition, Schlagal testified about a "frantic phone call from [my] stepmother who—they were trying to keep [Webb] online while they were going to notify the Hobbs police that he was going to have me killed because I had tried to have him killed."

Schlagal produced evidence from which the trial court could have found that there were reasonable grounds to believe that Webb engaged in a knowing course of conduct or scheme designed to place Schlagal in fear of bodily injury or death. *See Manuel v. State*, 357 S.W.3d 66, 83 (Tex. App.—Tyler 2011, pet. ref'd) (holding sufficient evidence, under Section 42.072, when defendant engaged in prolonged irrational conduct and sent multiple text messages and voice mails to victim); *Allen v. State*, 218 S.W.3d 905, 907-08 (Tex. App.—

Beaumont 2007, no pet.) (holding sufficient evidence of knowing course of conduct or scheme, under Section 42.072, where defendant made multiple calls to victim); *Sisk v. State*, 74 S.W.3d 893, 898 (Tex. App.—Fort Worth 2002, no pet.) (holding sufficient evidence, under Section 42.072, where defendant was abusive during short marriage, and after divorce and protective orders, defendant knowingly continued to contact victim and placed her in fear of bodily injury or death); *Battles v. State*, 45 S.W.3d 694, 700 (Tex. App.—Tyler 2001, no pet.) (holding sufficient evidence, under Section 42.072, that defendant's contact with victim and threats to her child were a knowing scheme to place victim in fear of bodily injury or death). After a review of the record and cognizant of the lower "preponderance of the evidence" standard of proof for a civil case, we hold that there was some evidence that Webb engaged in knowing behavior that constituted stalking, as defined in the 2011 statute, and provided reasonable grounds for the trial court to issue a protective order. *See* CRIM. PROC. art. 7A.03; PENAL § 42.072.

Appellant argues that the trial court's findings were against the great weight and preponderance of the evidence because he did not knowingly engage in conduct that placed Schlagal in fear of bodily injury and because a reasonable person would not have been in fear of bodily injury. Schlagal testified that she received a frantic phone call from her stepmother about an online post in which Webb had threatened to kill Schlagal because he believed she had tried to kill him. Webb denied that he ever made any such post. Schlagal never saw the post herself, as it was deleted "within the hour," and neither Schlagal's stepmother nor the person who told the stepmother about the post testified.

While they were married, Webb allegedly locked Schlagal in a room, along with

himself, and interrogated her about "who the pimps, the tricks, and the drug dealers were that were breaking into his home." Schlagal had called the police on Webb after he threatened her, and the police asked him to leave the house. When asked about this particular incident, Schlagal testified that Webb "was threatening me. He was very delusional. He was screaming." But she said that he did not make a direct threat to kill her at that time.

Schlagal described how Webb had stalked her during the year and a half prior to the protective order hearing "[b]y continuing to try to find my whereabouts through Facebook friends, by e-mailing people, forwarding people e-mails accusing me, even my family.... The names he's using of my family, the threats that are being made against my family, all of those things. I mean, there's numerous things." Schlagal described Webb as "delusional," and Detective Rodriguez corroborated her testimony.

Schlagal also introduced the November 2012 and October 2013 e-mails as well as the map Webb drew of the tunnel and pathways underneath his house. Schlagal also talked about State's Exhibit No. 4 [7] as "a packet of e-mails and Facebook postings that [she] printed off and brought to [the district attorney's] office." Schlagal explained that the documents partially showed, "what [she had] been going through with this man in detail, and it's in his words." She had not maintained contact with him "[b]ecause his delusions have affected [her] life in a very negative way." Schlagal said that she was scared of Webb. She went on to say that members of Webb's "family have contacted [her] numerous times throughout this ordeal" and were "in fear of [her] life."

Webb testified that he had last seen Schlagal approximately eighteen months prior to the hearing. He claimed that she lived in Lubbock. Schlagal was "worried that [Webb] would find out that [she] had moved back to [Midland]." Webb admitted that he sent the November 2012 and October 2013 e-mails and denied that he received an e-mail from her that told him to cease all contact with her. He sent his e-mails after Schlagal's ex-boyfriend, Welch, contacted Webb about Webb's gunshot injury. Webb denied that he ever threatened, hit, or stalked Schlagal.

Webb admitted that he had called the police, Texas Rangers, FBI, and attorney general and reported that his gunshot injury was a murder attempt on his life. He further acknowledged that he had sent several e-mails to police about the murder attempt. In his words, "[Schlagal] would be the most obvious suspect." Webb acknowledged that he sent Schlagal e-mails and made Facebook postings about her and that he deleted posts. In some of the posts and e-mails, he claimed that she was involved in a murder attempt on his life.

When conflicting evidence exists, the factfinder may believe one witness and disbelieve others. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). The trial court was free to believe that Webb's gunshot injury was a self-inflicted wound that he caused when he set off the tripwire device he had set up in his home. The trial court was also free to believe Schlagal's testimony that Webb would not leave her alone, that he looked for her, and that he had posted a threat to kill her. The trial court may draw inferences from the facts and choose between conflicting inferences. *Ramo, Inc. v. English*, 500 S.W.2d 461, 467 (Tex. 1973); *Lakner v. Van Houten*, No. 01-09-00422-CV, 2011 WL 1233381,

---

7. Exhibit No. 4 was not offered into evidence at the hearing and is not part of the record.

at *3 (Tex. App.—Houston [1st Dist.] Mar. 31, 2011, no pet.) (mem. op.). The trial court chose to believe the police and Schlagal and not to believe Webb. We hold that Schlagal adduced factually sufficient evidence that she was a victim of stalking—i.e., that Webb knowingly engaged in conduct that placed Schlagal in fear of bodily injury and that a reasonable person would have been in fear of bodily injury. *See Manuel*, 357 S.W.3d at 83; *Allen*, 218 S.W.3d at 907-08; *Sisk*, 74 S.W.3d at 898; *Battles*, 45 S.W.3d at 700. We overrule Appellant's second issue.

*D. Issue Three: The trial court did not violate Appellant's First Amendment rights under the United States Constitution.*

 On appeal, Webb asserts that his First Amendment rights were violated by the protective order. He asserts that his two e-mails were constitutionally protected speech. Schlagal argues that Webb did not make this argument at the trial court level and that the "as applied" challenge is waived and inadequately briefed. We agree with Schlagal that Webb has failed to preserve the "as applied" challenge on First Amendment grounds concerning his e-mails because he did not object at trial on this basis. TEX. R. APP. P. 33.1(a); *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993). But even if we are incorrect, e-mails that are part of a scheme that places another in fear of bodily injury are not constitutionally protected speech. "A threat is not protected speech." *Webb v. State*, 991 S.W.2d 408, 415 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). "[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself." *Frieling v. State*, 67 S.W.3d 462, 473 (Tex. App.—Austin 2002, pet. ref'd) (quoting *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990)). Courts have made distinctions between communication and harassment; the differ-

ence is one between free speech and conduct that may be proscribed. *Test Masters Educ. Servs. v. Singh*, 428 F.3d 559, 580 (5th Cir. 2005). To the extent that Webb's e-mails and online posts constituted stalking or threatened Schlagal, they were not protected speech under the First Amendment. *See Webb*, 991 S.W.2d at 415; *see also Ploeger v. State*, 189 S.W.3d 799, 813 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (stalking statute not unconstitutional, as applied, where statute proscribed conduct not protected by First Amendment). We overrule Appellant's third issue.

*E. Issues Four and Five: As applied to Appellant, Articles 7A.03, 7A.05, and 7A.07 are not unconstitutionally vague or overbroad and do not infringe on the Second Amendment of the United States Constitution or Section 23 of Article 1 of the Texas Constitution.*

In his motion for new trial, Appellant asserted that Chapter 7A of the Texas Code of Criminal Procedure was constitutionally invalid "on its face" due to vagueness and overbreadth. He also asserted that Chapter 7A of the Texas Code of Criminal Procedure was unconstitutional, as applied to him, under the First, Second, Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and Sections Eight, Nine, Thirteen, Nineteen, and Twenty-Three of Article 1 of the Texas Constitution.

*1. Appellant's failure to brief and inadequate briefing results in a waiver.*

 In his brief on appeal, Appellant did not address any "facial challenge," nor does he address his "as applied" claims about the Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and Sections Eight, Nine, Thirteen, and Nineteen of Article 1 of the Texas Constitution. Thus, those issues are not before us. *See* TEX. R. APP. P. 38.1; *see*

*also Cain v. State*, 501 S.W.3d 172, 176 (Tex. App.—Texarkana 2016, no pet.); *Mathews v. State*, 918 S.W.2d 666, 667 n.2 (Tex. App.—Beaumont 1996, pet. ref'd). In addition, Appellant advances a "due process" claim on appeal that he did not raise at trial; therefore, he has failed to preserve that issue for appellate review. *See* Tex. R. App. P. 33.1; *Dreyer*, 871 S.W.2d at 698. In addition, Appellant intermingles his arguments on federal and state constitutional grounds.[8]

Therefore, we note that, other than the challenge under the First Amendment that we addressed in Webb's third issue, all that potentially remains of Appellant's challenges is an "as applied" challenge to the constitutionality of Articles 7A.03, 7A.05, and 7A.07, specifically the enjoinment of his ownership of firearms and the suspension of his concealed handgun license, as violative of the Second Amendment to the United States Constitution and Section 23 of Article 1 of the Texas Constitution.

### 2. Whether Appellant has standing.

■ Before we can decide whether a statute is constitutional, we must first resolve whether the party raising the claim has standing. *See Meshell v. State*, 739 S.W.2d 246, 250 (Tex. Crim. App. 1987). In addition, for appellant to have standing to invoke Article I, Section 23, he must first show he is a state citizen. *Jordan v. State*,

56 S.W.3d 326, 330 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). Furthermore, to preserve an "as-applied" challenge to the constitutionality of a statute, the defendant must have first raised the issue in the trial court. *See In re Barr*, 13 S.W.3d 525, 555 (Tex. Rev. Trib. 1998) (preservation of error); *Garcia v. State*, 887 S.W.2d 846, 861 (Tex. Crim. App. 1994); *Eckchum v. State for Prot. of Ketchum*, No. 03-15-00270-CV, 2016 WL 3677122, at *6-7 (Tex. App.—Austin July 7, 2016, no pet.).

■ In this case, Webb advanced an "as applied" challenge in his motion for new trial with respect to the firearms possession injunction and the suspension of his concealed handgun license, both of which he addressed in his brief.[9] At the hearing, Webb indicated that he lived and resided in Midland, Texas, and had been married and divorced in Texas. In his motion for new trial and brief, he asserted that he is personally aggrieved by the protective order. We hold that Webb has standing and that, because he raised his "as applied" constitutional challenge at the trial court level, he has preserved that issue for our review.

### 3. Appellant's "as applied" Second Amendment and Article 23 of the Texas Constitutional challenges fail.

Appellant claims that Chapter 7A, specifically Articles 7A.03, 7A.05, and 7A.07

---

8. Although a civil case, this appeal involves two criminal statutes, and the Texas Court of Criminal Appeals has recognized, "[a]ttorneys, when briefing constitutional questions, should carefully separate federal and state issues into separate grounds and provide substantive analysis or argument on each separate ground. If sufficient distinction between state and federal constitutional grounds is not provided by counsel, this Court may overrule the ground as multifarious." *Heitman v. State*, 815 S.W.2d 681, 690 n.23 (Tex. Crim. App. 1991); *see Lawton v. State*, 913 S.W.2d 542, 558 (Tex. Crim. App. 1995), *overruled on other* grounds *by Mosley v. State*, 983 S.W.2d 249, 263 n.18 (Tex. Crim. App. 1998).

9. We note that Webb provided notice of his constitutional challenges to the attorney general. *See* Tex. Gov't Code Ann. § 402.010(a), (a-1) (West Supp. 2016) (setting forth procedure for notifying attorney general of any pleading challenging constitutionality of Texas statute that is filed by party to litigation, if attorney general is not party to or involved in such litigation as counsel, and providing copy of that pleading to attorney general); *see also Eckchum*, 2016 WL 3677122, at *7.

are unconstitutional. He asserts that the statutes allow a lifetime injunction on the possession of firearms and the suspension of his concealed handgun license, and as applied to him, impermissibly infringe on his rights under the Second Amendment of the United States Constitution and Section 23 of Article 1 of the Texas Constitution. The latter provides that every citizen has "the right to keep and bear arms in the lawful defense of himself or the State" but that the legislature may "regulate the wearing of arms, with a view to prevent crime." TEX. CONST. art I, § 23. Because Appellant briefed both challenges together, we will address them collectively.

### a. Applicable law for "as applied" claims

In Appellant's "as applied" challenge, the burden is upon the party attacking the constitutionality of an act of the legislature. *Robinson v. Hill*, 507 S.W.2d 521, 524 (Tex. 1974). We presume that an act of the legislature is constitutional. *See Sax v. Votteler*, 648 S.W.2d 661, 664 (Tex. 1983). If possible, we construe a statute in a manner that renders it constitutional and gives effect to the legislature's intent. *See Quick v. City of Austin*, 7 S.W.3d 109, 115 (Tex. 1998); *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex. 1998). We presume that the legislature intended for the law to comply with the United States and Texas Constitutions, to achieve a just and reasonable result, and to advance a public rather than a private interest. TEX. GOV'T CODE ANN. § 311.021 (West 2013); *Spence v. Fenchler*, 107 Tex. 443, 180 S.W. 597, 605 (1915). Nevertheless, the legislature may not authorize an action that our Constitution prohibits. *Maher v. Lasater*, 163 Tex. 356, 354 S.W.2d 923, 925 (1962); *Travelers' Ins. Co. v. Marshall*, 124 Tex. 45, 76

S.W.2d 1007, 1009 (1934). The courts of this state will hold an act unconstitutional only if a specific constitutional provision inhibits the legislation, or such is clearly implied. *Shepherd v. San Jacinto Junior Coll. Dist.*, 363 S.W.2d 742, 743 (Tex. 1962).

In an "as applied" constitutional challenge, we must evaluate the statute as it operates in practice against the particular claimant. *See Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 381 (Tex. 2002); *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 518 n.16 (Tex. 1995). In such a challenge, the claimant asserts that a statute, while generally constitutional, operates unconstitutionally as to him because of his particular circumstances. *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 702 (Tex. 2014); *Garcia*, 893 S.W.2d at 518 n.16.

Because Webb has briefed only an "as applied" challenge, he has conceded the general constitutionality of the statute. *See State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011); *see also Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 461 n.5 (Tex. 1997). And, "[b]ecause a statute may be valid as applied to one set of facts and invalid as applied to a different set of facts, a litigant must show that, in its operation, the challenged statute was unconstitutionally applied to him; that it may be unconstitutional as to others is not sufficient (or even relevant)." *Fine*, 330 S.W.3d at 910; *see Lewellen*, 952 S.W.2d at 461 n.5; *see also Vuong v. State*, 830 S.W.2d 929, 941 (Tex. Crim. App. 1992). We must evaluate the statute as it operates in practice against Webb.[10]

---

**10.** "In construing the statute and its effect, we consider several factors, including: the

### b. Legislative Enactments

Enacted in 2003 as part of Senate Bill 433, the title and purpose of Chapter 7A of the Code of Criminal Procedure is to protect victims of sexual offenses, stalking, and trafficking without having to establish a family or dating relationship with the offender, as required under the Texas Family Code to obtain a protective order. *See* Act of May 20, 2003, 78th Leg., R.S., ch. 836, § 1, 2003 Tex. Gen. Laws 2622, 2622–23 (codified at CRIM. PROC. ch. 7A). In accordance with Article 7A.05, a trial court may order the alleged offender to take certain action that the court determines is necessary or appropriate to prevent or reduce the likelihood of future harm to the applicant or a member of the applicant's family or household, including a restriction on possession of firearms. CRIM. PROC. art. 7A.05(a)(1). Article 7A.05 provides that the trial court may "prohibit the alleged offender from" possessing a firearm and may suspend the alleged offender's handgun license. *Id.* art. 7A.05(a)(2)(D), (c). In 2007, the legislature added Article 7A.07, which provides that the duration of the protective order could be effective for the lives of the victim and the offender. CRIM. PROC. art. 7A.07; *see* Act of May 25, 2007, 80th Leg., R.S., ch. 882, § 3, 2007 Tex. Gen. Laws 1902. If the trial court does not specify a duration in the order, the order expires after two years, but the trial court may order that the protective order is effective for a longer period. CRIM. PROC. art. 7A.07(a). Article 7A.07 also provides that the victim of the offense may petition the court to rescind the order. CRIM. PROC. art. 7A.07(b).

### c. The Second Amendment

The Second Amendment to the United States Constitution provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The United States Supreme Court has outlined that "[t]he right to keep arms involves, necessarily, the right to use such arms for all the ordinary purposes, and in all the ordinary modes usual in the country, and to which arms are adapted, limited by the duties of a good citizen in times of peace." *D.C. v. Heller*, 554 U.S. 570, 614, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (quoting *Andrews v. State*, 50 Tenn. 165, 178-79 (1871)). This right applies to the States. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 791, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). Gun-control regulations impose varying degrees of burden on Second Amendment rights, and individual assertions of the right may come in many forms. *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010). A severe burden on the Second Amendment right of armed self-defense should require strong justification. *Id.* But as the Fourth Circuit Court outlined in *Chester*, the Second Amendment is no more susceptible to a one-size-fits-all standard of review than any other constitutional right. *Id.* Less severe burdens on the right—laws that merely regulate, rather than restrict, and laws that do not implicate the central self-defense concern of the Second Amendment—may be more easily justified. *Id.*

Although "the Second Amendment *does* protect individual rights, that does

statute's purpose; the circumstances of the statute's enactment; the legislative history; common-law or former statutory provisions, including laws on the same or similar subjects; a particular construction's consequences; administrative construction of the

statute; and the title, preamble and emergency provision." *Tex. Mun. League Intergovernmental Risk Pool*, 74 S.W.3d at 381 (citing Gov't § 311.023; *Ken Petroleum Corp. v. Questor Drilling Corp.*, 24 S.W.3d 344, 350 (Tex. 2000)).

not mean that those rights may never be made subject to any limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001). For example, Congress had a substantial and compelling government interest to decrease domestic violence when it enacted Section 922(g)(8) of Title 18 of the United States Code, which disallows gun possession by individuals subject to domestic protective orders. *United States v. Lippman*, 369 F.3d 1039, 1044 (8th Cir. 2004). Section 922(g)(8)'s legislative history is fully consistent with this position. *United States v. Chapman*, 666 F.3d 220, 226 (4th Cir. 2012). Likewise, the Fourth, Sixth, Eighth, and Tenth Circuits have subjected Section 922(g)(8) to intermediate scrutiny. *See Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 692–93 (6th Cir. 2016); *United States v. Mahin*, 668 F.3d 119, 123 (4th Cir. 2012); *United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011); *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010); *Chapman*, 666 F.3d at 226.

#### d. Analysis of Webb's "as applied" claims

The *Chester* court held that Chester's alleged Second Amendment claim was not within the core right identified in *Heller*— the right of a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense—by virtue of Chester's criminal history as a domestic violence misdemeanant. *Chester*, 628 F.3d at 682–83 (citing *Heller*, 554 U.S. at 634-35, 128 S.Ct. 2783). In *Chester*, the court held that intermediate scrutiny was the appropriate standard of review for Chester and *similarly situated persons. Chester*, 628 F.3d 673, 682–83. The *Chester* court went on to explain that

intermediate scrutiny requires the government show a "reasonable fit," not a perfect fit, between the challenged regulation and a substantial government objective. *Id.*

The rationale, as explained in *Chester*, applies equally to Webb even though he has not been convicted of a misdemeanor offense. Chapter 7A's purpose is to protect victims of various offenses, including stalking and sexual assault, and to allow these victims to seek protection from those who committed the offense. *See* CRIM. PROC. art. 7A.01. The legislative history of Chapter 7A (2003 Senate Bill 433) includes a bill analysis from the Senate Research Center, which provides in part:

> Currently, Texas law provides that a person who is battered, sexually assaulted, or harassed by a family member, household member, or by someone the person is dating may seek protection under the Texas Family Code. This remedy is not available to a person who is battered, sexually assaulted, or harassed by a stranger or a friend/acquaintance in a non-dating relationship. As proposed, S.B. 433 creates a Sexual Assault Order of Protection that would be available to individuals alleging sexual assault and would be available to a victim who has no prior relationship with the perpetrator.

Bill Analysis, Tex. S.B. 433, 78th Leg., R.S. (2003). The House Research Organization's bill analysis for Senate Bill 433 outlined the following:

> SB 433 logically would extend the list of those who can apply for a protective order to include sexual assault victims who do not have a familial, household, or dating relationship with the offender.... Protective orders have been proven effective, and applicants are less

likely to suffer future violence once an order is in place.

*Id.* We further note that the statute applies only to persons who have been shown to have engaged in trafficking of a person, sexual assault or abuse of a person, stalking, or compelling prostitution. *See* CRIM. PROC. art. 7A.01; *see also Ploeger*, 189 S.W.3d at 812-14 (stalking statute not facially overbroad or vague because statute specifically provides what conduct is prohibited and subject to prosecution, and statute was not unconstitutional, as applied, because defendant's conduct was not protected by First Amendment).

The rationale in *Chester* further applies here because Webb has demonstrated through his words and actions that he is not only delusional but a significant and life-threatening danger to himself and to Schlagal. Webb maintains, despite all of the evidence to the contrary, that Schlagal was involved in a prostitution ring, in his self-inflicted gunshot wound, and his mother's death, and he has threatened Schlagal's death in retribution. In *Emerson*, the Fifth Circuit outlined that the government may enact restrictions on the possession of firearms: "[I]t is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms." 270 F.3d at 261; *see Heller*, 554 U.S. at 631, 128 S.Ct. 2783. Here, Webb continued to put Schlagal in fear for her life with e-mails and online posts that accused her of trying to kill him and with threats to kill her. In addition, the record showed that Webb had shot himself with a 12-gauge shotgun attached to a tripwire device in his home. The police thought he was delusional and took his guns from him before Schlagal ever filed for a protective order.

As we have explained under the intermediate scrutiny standard, we decline to hold that the protective order has impermissibly infringed on Webb's Second Amendment rights because the protective order supported a substantial government objective to protect victims of stalking and because the restriction imposed on Webb was a reasonable fit to achieve the statute's objective. Furthermore, with the evidence presented in this case, and all that we have outlined about Chapter 7A, we hold that Articles 7A.03, 7A.05, and 7A.07 of Texas Code of Criminal Procedure, as applied to Webb, do not infringe on his Second Amendment right to bear arms and are not unconstitutional, as applied to him, under Section 23, Article 1 of the Texas Constitution. We overrule Webb's fourth and fifth issues on appeal.

*F. Issue One: The trial court did not abuse its discretion when it refused to make additional findings of fact and conclusions of law.*

Upon a party's timely request for additional findings of fact and conclusions of law, the trial court shall file any additional or amended findings of fact and conclusions of law that are appropriate. TEX. R. CIV. P. 298. Additional findings of fact and conclusions of law are not required if the original findings of fact and conclusions of law adequately relate the facts and law necessary to present the party's appeal. *Finch v. Finch*, 825 S.W.2d 218, 221 (Tex. App.—Houston [1st Dist.] 1992, no writ). A trial court's failure to make additional findings of fact and conclusions of law will not be reversed unless the record affirmatively shows that the complaining party has suffered an injury. *Cherne Indus., Inc. v. Magallanes*, 763 S.W.2d 768, 772 (Tex. 1989). If the refusal to file additional findings of fact and conclusions of law does not prevent a party from adequately presenting an argument on appeal, there is no reversible error. *ASAI v. Vanco Insulation Abatement, Inc.*, 932 S.W.2d 118, 122 (Tex. App.—El Paso 1996, no writ). In this case, the trial

court had the discretion to refuse to supplement the original findings of fact and conclusions of law because its original findings adequately related the facts and law necessary to Webb's appeal. *See Finch*, 825 S.W.2d at 221. Furthermore, Webb did not suffer any injury because he was able to present his arguments on appeal. We overrule Webb's first issue.

## IV. *Conclusion*

We affirm the order of the trial court.