**Opinion issued December 10, 2020**



In The

# Court of Appeals

For The

# First District of Texas

————————————

### NO. 01-19-00348-CV

————————————

## CARL  EMANUEL  LEWIS, Appellant

## V.

## BRIDNEY  YANCY, Appellee

On Appeal from the 280th District Court
Harris County, Texas
Trial Court Case No. 2019-15182

## MEMORANDUM OPINION

This is an appeal from a protective order granted by the trial court against appellant, Carl Emanuel Lewis.  In four issues, Lewis complains that (1) the evidence is legally and factually insufficient to support issuance of the protective order; (2) the protective order exceeds the time limitation under Texas Family Code

section 85.025 and conflicts with temporary orders issued by another court of concurrent jurisdiction; (3) the trial court conducted an evidentiary hearing related to issues previously decided by another court of concurrent jurisdiction and, therefore, the presentation of evidence was barred by res judicata; (4) certain provisions of the protective order are inconsistent and render the order void. We affirm in part and reverse and remand in part.

## Background

Lewis and appellee, Bridney Yancy, were in a dating relationship for seven years. Yancy began living with Lewis after their son, C.L., was born in 2014.

On January 15, 2019, Yancy filed an original petition in a suit affecting the parent-child relationship ("SAPCR"). On February 6, 2019, the 311th District Court of Harris County, Texas, signed an agreed band-aid order setting forth the parents' possession schedule and related matters. The record does not contain a copy of the original petition or the trial court's temporary orders in the SAPCR.

On February 28, 2019, Yancy filed an application for protective order against Lewis, to which she attached her affidavit in support of the application. On March 11, 2019, Lewis filed an answer to the application for protective order. On March 12, 2019, the trial court began a three-day bench trial on Yancy's application for protective order.

At the hearing, Yancy testified that Lewis was violent on numerous occasions during the course of their relationship. The first incident occurred in mid-2015 when Lewis began "getting in [her] face" and yelling at her. Yancy testified that Lewis hovered over her as she repeatedly tried to get out of his way. When Lewis began making a fist, Yancy pleaded with him not to hit her. Lewis responded, "I do whatever I want in the house that I have paid for." Yancy testified that Lewis grabbed her by the arm, leaving a bruise.

The next incident occurred in December 2015. Yancy testified that Lewis got in her face again and hovered over her, pushing his body against her. Yancy testified that she felt scared.

On December 21, 2015, Lewis became upset with Yancy because she had not done anything around the house. Lewis threw dishes, picture frames, and glasses and told Yancy to get out of the house. C.L. was in the room at the time and witnessed the incident. Yancy tried to pick C.L. up so that he would not get cut by the glass, but Lewis would not let her touch him. Yancy testified that when she told Lewis that she would not leave without C.L., Lewis threatened to shoot her. Yancy recorded the incident on her phone and later transcribed it. The trial court admitted a flash drive of the audio recording and the written transcript into evidence. In the audio, Lewis can be heard telling Yancy that he was going to "make this trip to [his] effing car" and that Yancy should "be at [the house] when [he] gets back." Yancy

3

testified that Lewis intended to get his gun from the car and come back to shoot her. She testified that she was scared for her life and began crying. When Lewis left the house, Yancy called the police. The police report was admitted into evidence. Lewis told Yancy that he would kill her if she called the police again.

In 2016, Lewis returned home from work one day and started yelling because "the house wasn't the way he wanted it to be." C.L. was playing with his toys on the floor. When Yancy began picking up the toys, Lewis approached her and slapped a toy out of her hand. C.L. began crying and put his hands over his ears. Yancy testified that when she told Lewis not to do that in front of C.L., Lewis told Yancy that he would teach C.L. to not be with someone like her.

In September 2017, Yancy's best friend, Kimberly Williams, came over to the house one morning so that they could do one another's make-up before going to work together at Olive Garden. While they were in the bathroom getting ready, Lewis knocked on the door to use the restroom. When Lewis saw Williams, he became angry and began yelling at Yancy. As Yancy tried to walk away, Lewis grabbed her and pushed her to the floor. Lewis began throwing Yancy's clothes and shoes and told her to get out of the house. C.L. woke up and Williams took him to the living room so that he would not witness the incident. Lewis eventually left the house with C.L. Yancy testified that she bruised her leg in the fall. A photo of her bruise was admitted into evidence.

In May 2018, Lewis became angry with Yancy and started yelling at her and pushing up against her. When Yancy asked Lewis to stop doing that in front of C.L., Lewis responded that he would teach C.L. to hate her. When Yancy tried to pick C.L. up, Lewis took the child and told Yancy not to touch his son. Later that day, Lewis sent Yancy the following text message: "D[on't] be stupid and try to take my son, sh[i]t gone play out totally different this time[.]" The text message was admitted into evidence.

When asked whether there were incidents involving a gun, Yancy testified about one occasion when Lewis began arguing with another driver while they were driving home with C.L. When Yancy asked him not to engage with the other driver because "people are crazy nowadays," Lewis pulled his gun out, began waving it around, and said, "Well, I have a gun and they ain't going to do shit to me." When Yancy told him "that's nonsense," Lewis began hitting her and pushed her out of the car. Lewis returned about ten minutes later to pick her up.

In late 2018, Lewis became upset with Yancy because he thought she had misplaced something and began cursing at her. Yancy testified that Lewis pushed her against a wall and told her to get out. When Yancy said that she would not leave without C.L., Lewis replied, "that's allright, bitch. I got something for your bitch ass," and he went to his room where he kept a loaded gun. Yancy began crying and

5

Lewis called Yancy's brother to come get her. Yancy eventually left and went to work.

In 2019, after Lewis and Yancy were evicted from their home, Yancy went to live with her mother. During this time, Lewis and Yancy shared in C.L.'s care and watched him while the other one worked. In January 2019, Lewis called Yancy at work after C.L.'s food stamp card did not work at the grocery store. He became angry and told her that he knew she was trying to take his son from him, he knew where her mother lived, and that he would come kill her.

Yancy testified that she decided to seek a protective order because she feared that Lewis would retaliate against her if she were awarded custody of C.L., and she wanted to protect C.L. from witnessing Lewis's abuse in the future. Yancy testified that she has never committed family violence against Lewis.

Casey Bachus, a service manager at Olive Garden, testified that a man who identified himself as Yancy's brother called the restaurant in January 2019 and asked to speak to Yancy. When Yancy took the call, Bachus heard the man yelling and tell Yancy that he was going to shoot her. Bachus testified that Yancy's "eyes got wide and she looked terrified," and she asked Bachus to let her leave early to avoid Lewis. Bachus testified that Yancy had previously shown him a picture of her bruised leg and told Bachus that Lewis had guns and would find her and shoot her.

Bachus stated that Yancy left with two other employees because she did not want to leave by herself.

Kimberly Williams testified about the incident that occurred when she went to Yancy's house in 2017. After Lewis came out of the bathroom and saw Williams, he asked Yancy why she had people over to the house without telling him, and he told her that she did not do anything around the house or pay for anything. Williams testified that when Yancy began walking away, Lewis grabbed her by the arm and threw her to the bedroom floor, calling her "stupid bitch." When Yancy tried to get up, Lewis blocked her and kept bumping against her. William testified that C.L. woke up and started crying. Lewis told Yancy to get out of his house and began throwing her belongings out of the closet. Williams took C.L. outside to calm him down. After Lewis took C.L. and left the house, Williams found Yancy crying in the closet. Williams testified that she witnessed Lewis verbally abusing Yancy on multiple occasions.

Deshonder Harrison, Yancy's mother, testified about a road rage incident that occurred two or three years earlier. Lewis was driving and Yancy, C.L., Harrison, and Harrison's niece were passengers when another driver got too close to their car while trying to change lanes. Lewis began cursing at the driver and the driver rolled down his car window. Harrison testified that Lewis said, "don't have me [] get my bag out and [] pull my gun out." When Yancy told Lewis not to do that, Lewis told

her to shut up. Lewis later apologized to Harrison and acknowledged that he had an anger management problem and needed to get help. Harrison testified that Yancy was extremely scared of Lewis, and that Yancy told her that Lewis threatened to shoot her if she ever tried to take C.L.

Steven James Pipkin lived with Lewis and Yancy for approximately six months in 2016. Pipkin testified that one evening while he was watching television, he heard Lewis and Yancy arguing about Yancy not cleaning the house or not properly feeding C.L. When Pipkin walked out of his room, he saw Yancy holding a knife and then quickly put it on the kitchen counter. At Lewis's request, Pipkin took C.L. into his room. Pipkin later called the police.

Lewis testified that, other than the December 21, 2015 incident recorded by Yancy, none of the other alleged incidents occurred. He testified that he never threatened Yancy, but Yancy was violent with him on several occasions. He testified that on one occasion when C.L. was a couple of months old, he and Yancy were having a disagreement and Yancy threw a lamp at him while he was holding C.L. In May 2016, Lewis came home and became upset when he discovered that Yancy had drunk a wine cooler while taking care of C.L. Lewis testified that Yancy once pulled a knife on him, and, on another occasion, Yancy punched him in the face while he was holding C.L. Lewis testified that there is no possibility of his harming Yancy in the future because they currently only communicate about C.L.

8

Corliss Lewis, Lewis's mother, testified that she never saw her son become violent but that she has seen him get angry if the house is dirty. She testified that police called her to Lewis and Yancy's home in May 2016 after Yancy pulled a knife on Lewis.

On April 25, 2019, the trial court signed a protective order, which stated, in part, as follows:

*Findings*

The Court finds that the parties were in a dating relationship <u>or</u> former members of same household <u>or</u> are family members.

The Court finds that family violence has occurred, and that family violence is likely to occur in the future. The Court finds that Respondent, CARL EMMANUEL LEWIS, has committed family violence. The Court finds that the following protective orders are for the safety and welfare and in the best interest of [Yancy] and other members of the family and are necessary for prevention of family violence.

This appeal followed.

## Sufficiency of the Evidence

In his first issue, Lewis contends that the trial court erred because the evidence is legally and factually insufficient to support issuance of a protective order.

### A. Standards of Review

When the trial court acts as a factfinder, we review its findings under the legal and factual sufficiency standards. *Boyd v. Palmore*, 425 S.W.3d 425, 429 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *In re Doe*, 19 S.W.3d 249, 253 (Tex.

9

2000)). When a party who does not have the burden of proof at trial challenges the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *City of Hous. v. Hildebrandt*, 265 S.W.3d 22, 27 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (citing *Assoc. Indem. Corp. v. CAT Contracting, Inc*., 964 S.W.2d 276, 285–86 (Tex. 1998)). If more than a mere scintilla of evidence exists, it is legally sufficient and we will overrule that issue. *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005); *Hildebrandt*, 265 S.W.3d at 27. There is more than a scintilla of evidence if the evidence rises to a level that would enable reasonable and fair-minded people to reach differing conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

In reviewing factual sufficiency, we examine the entire record in order to consider and weigh all the evidence, both in support of, and contrary to, the challenged finding. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Boyd*, 425 S.W.3d at 429. After considering and weighing all the evidence, we set aside the verdict only if the evidence is so weak, or the finding is so against the great weight and preponderance of the evidence, that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We cannot substitute our opinion for that of the

trier of fact merely because we might reach a different conclusion. *Boyd*, 425 S.W.3d at 429. The trier of fact remains the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id*. at 431.

## B. Applicable Law

The Texas Family Code provides that a court shall enter a protective order if it finds that family violence (1) has occurred and (2) is likely to occur in the future. TEX. FAM. CODE §§ 81.001, 85.001. "Family violence" is defined, in pertinent part, as:

> [A]n act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself.

*Id.* § 71.004(1). "The purpose of the protective order statute is not to remedy past wrongs or punish prior criminal acts; rather, it seeks to protect the applicant and prevent future violence." *Roper v. Jolliffe*, 493 S.W.3d 624, 634–35 (Tex. App.— Dallas 2015, pet. denied).

In addition to acts intending physical harm, threats that reasonably place the victim in fear of imminent harm constitute family violence. *See, e.g., Boyd*, 425 S.W.3d at 430–31 (concluding that appellant committed act of family violence when he blocked appellee's car with his body and jumped on hood of car); *Clements v. Haskovec*, 251 S.W.3d 79, 85–86 (Tex. App.—Corpus Christi 2008, no pet.)

(concluding that appellant committed act of family violence by raising his fist and making other threats though he never actually struck family member). In cases involving protective orders against family violence, evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue this behavior in the future. *See Teel v. Shifflett*, 309 S.W.3d 597, 604 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("The trial court reasonably could have concluded that future violence is likely to occur based on the testimony showing a pattern of violent behavior."); *In re Epperson*, 213 S.W.3d 541, 543–44 (Tex. App.—Texarkana 2007, no pet.) (concluding past and continuing pattern of behavior showed applicant was reasonable in fearing respondent would commit acts of "family violence" in future).

## C. Analysis

The evidence, viewed in the light most favorable to the trial court's finding, shows that Lewis was verbally and physically abusive to Yancy on numerous occasions, and that C.L. often witnessed these incidents. In 2015, Lewis grabbed Yancy by her arm, leaving a bruise. Later that year, Lewis threw dishes, picture frames, and glasses, and told Yancy to get out of the house. When Yancy told Lewis that she would not leave without C.L., Lewis threatened to shoot her. Lewis also told Yancy that he would kill her if she called the police again.

In 2017, Lewis became angry after discovering that Yancy had invited her friend to the house. When Yancy tried to walk away, Lewis grabbed her and pushed her to the floor, causing Yancy to bruise her leg in the fall.

In 2018, Lewis became angry with Yancy and started yelling at her and pushing up against her. Later that day, Lewis sent Yancy the following text message: "D[on't] be stupid and try to take my son, sh[i]t gone play out totally different this time[.]" On another occasion, Lewis exhibited road rage toward another driver while he and Yancy were driving home with C.L. When Yancy asked him not to engage with the other driver, Lewis pulled his gun out, began waving it around, and said, Well, I have a gun and they ain't going to do shit to me." When Yancy told him "that's nonsense," Lewis began hitting her and pushed her out of the car. Later that year, Lewis became upset with Yancy because he thought she had misplaced something and pushed her against a wall and told her to get out. When Yancy said that she would not leave without C.L., Lewis replied, "that's allright, bitch. I got something for your bitch ass," and he went to his room where he kept a loaded gun.

In 2019, Lewis called Yancy at work after C.L.'s food stamp card did not work at the grocery store. He became angry and told her that he knew she was trying to take his son from him, he knew where her mother lived, and that he would come kill her.

These incidents, along with Yancy's testimony about her fearfulness of Lewis as well as Bachus's and Harrison's testimony that Yancy was frightened of Lewis, provide legally sufficient evidence supporting the trial court's finding that Lewis committed "an act . . . that [was] intended to result in physical harm, bodily injury [or] assault . . . or that [was] a threat that reasonably place[d Yancy] in fear of imminent physical harm, bodily injury, [or] assault," and thus satisfied the definition of "family violence." *See* TEX. FAM. CODE § 71.004(1).

The evidence was also factually sufficient to support the trial court's finding that family violence occurred. As the factfinder, the trial court was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See Boyd*, 425 S. W.3d at 431; *see also Pena v. Garza*, 61 S.W.3d 529, 532 (Tex. App.—San Antonio 2001, no pet.) (noting trial court is free to reject or accept all or part of witness's testimony). Here, the trial judge heard the witnesses testify during the hearing and was free to believe Yancy's testimony regarding the abuse and to disbelieve Lewis's efforts to discredit that testimony. *See Boyd*, 425 S.W.3d at 431 (holding trial court was free to place greater weight on applicant's testimony when making family violence finding).

Lewis contends that even if the evidence is sufficient to show that family violence occurred, the evidence is insufficient to show a likelihood that violence will occur in the future. In support of his contention, Lewis points to evidence showing

14

that he and Yancy ceased to live together in December 2018, Lewis has not been violent with her since the separation, and no words have been exchanged since the band-aid order was issued.

Courts have observed that "[o]ftentimes, past is prologue; therefore, past violent conduct can be competent evidence which is legally and factually sufficient to sustain the award of a protective order." *In re Epperson*, 213 S.W.3d at 544 (citing *In re T.L.S.*, 170 S.W.3d 164 (Tex. App.—Waco 2005, no pet.)). The trial court heard evidence of Lewis's physical abuse of Yancy as well as his repeated threats and intimidation of her throughout their relationship. The evidence also showed that Lewis threatened Yancy on numerous occasions when he believed that Yancy was going to take C.L. from him, and Yancy testified that she feared Lewis would retaliate against her if she were awarded custody of C.L. The evidence is legally and factually sufficient to support the trial court's finding that Lewis would likely commit family violence in the future. *See Teel*, 309 S.W.3d at 604 ("The trial court reasonably could have concluded that future violence is likely to occur based on the testimony showing a pattern of violent behavior."); *In re Epperson*, 213 S.W.3d at 543–44 (concluding past and continuing pattern of behavior showed applicant was reasonable in fearing respondent would commit acts of "family violence" in future).

Lewis also argues that the protective order violates his due process rights because it potentially infringes on his Second Amendment right to possess a firearm

without the benefit of a jury trial. A review of the record reveals that Lewis did not raise his due process argument in the trial court. Therefore, he has failed to preserve that issue for our review. *See* TEX. R. APP. P. 33.1; *Webb v. Schlagal*, 530 S.W.3d 793, 806 (Tex. App.—Eastland 2017, pet, denied) (concluding ex-husband failed to preserve due process claim on appeal where he did not raise it at trial) (citing *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993) ("As a rule, a claim, including a constitutional claim, must have been asserted in the trial court in order to be raised on appeal.").

We overrule Lewis's first issue.

## Duration of Protective Order

In his second issue, Lewis contends that the protective order exceeds the time limitations under Texas Family Code section 85.025, and it conflicts with the temporary orders issued by a court of concurrent jurisdiction. Specifically, Lewis complains about the following language: "This order shall continue in full force and effect for the life of the Applicant BRIDNEY YANCY and until the child reaches the age of 18 unless otherwise modified later by this Court upon good cause shown."

Section 85.025(a) states that "[e]xcept as otherwise provided by this section, an order under this subtitle is effective: (1) for the period stated in the order, not to exceed two years; or (2) if a period is not stated in the order, until the second anniversary of the date the order was issued." TEX. FAM. CODE § 85.025(a). Section

85.0025(a-1), however, states that the duration of a protective order may exceed two years under certain circumstances:

(a-1) The court may render a protective order sufficient to protect the applicant and members of the applicant's family or household that is effective for a period that exceeds two years if the court finds that the person who is the subject of the protective order:

    (1) committed an act constituting a felony offense involving family violence against the applicant or a member of the applicant's family or household, regardless of whether the person has been charged with or convicted of the offense;

    (2) caused serious bodily injury to the applicant or a member of the applicant's family or household; or

    (3) was the subject of two or more previous protective orders rendered:

        (A) to protect the person on whose behalf the current protective order is sought; and

        (B) after a finding by the court that the subject of the protective order:

            (i) has committed family violence; and

            (ii) is likely to commit family violence in the future.

TEX. FAM. CODE § 85.025(a-1). Yancy argues that the acts that Lewis committed against her constitute felony offenses under subsections (1) and (2) and, thus, the trial court was authorized to extend the protective order beyond two years.

Section 85.001(d) provides that if a court renders a protective order for a period of more than two years, the court must include in the order a finding described by Section 85.025(a-1). TEX. FAM. CODE ANN. § 85.001(d). In his brief, Lewis

17

asserts that the trial court made no specific findings in the order which would justify a lifetime protective order, and that the trial court did not issue any findings of fact or conclusions of law. We agree. In its order, the trial court found that "the parties were in a dating relationship <u>or</u> former members of same household <u>or</u> are family members," "family violence has occurred, and that family violence is likely to occur in the future," Lewis "has committed family violence," and "the [] protective orders are for the safety and welfare and in the best interest of [Yancy] and other members of the family and are necessary for prevention of family violence." The protective order does not contain any of the required findings of section 85.025(a-1) to support a term of more than two years. *See* TEX. FAM. CODE § 85.001(d). Accordingly, we sustain Lewis's second issue.

### Evidentiary Hearing

In his third issue, Lewis contends that the trial court erred in conducting an evidentiary hearing regarding factual allegations underlying the protective order because another court had already made factual findings that were binding on the trial court under the doctrine of res judicata.

"Res judicata, also known as claim preclusion, prevents the relitigation of a finally adjudicated claim and related matters that should have been litigated in a prior suit." *State & Cty. Mut. Fire Ins. Co. v. Miller*, 52 S.W.3d 693, 696 (Tex. 2001). Res judicata is an affirmative defense that must be pleaded. TEX. R. CIV. P. 94;

18

*Whallon v. City of Hous.*, 462 S.W.3d 146, 155 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *Green v. Parrack*, 974 S.W.2d 200, 202 (Tex. App.—San Antonio 1998, no pet.) ((("Generally, res judicata must be pled or be waived"). Here, the affirmative defense of res judicata was neither pleaded nor raised in the trial court. Because it was waived at the trial court, Lewis may not raise it for the first time on appeal. *See Whallon*, 462 S.W.3d at 155.[1]

We overrule Lewis's third issue.

**Inconsistencies in Protective Order**

In his fourth issue, Lewis complains that two provisions in the protective order are contradictory so as to render the order void. Specifically, Lewis notes that the order names C.L. as a "protected person" and prohibits Lewis from, among other things, "going to or near, or within 400 feet of, any location" of a protected person. Lewis argues that this provision conflicts with the provision for his access to and possession of C.L., which states that "the pickup and drop off of the child shall be done in a public location where there are operational security cameras and a

---

[1] We further note that the record before us does not contain a copy of the 311th district court's temporary orders in the SAPCR. Although Lewis included a copy of unsigned temporary orders in the appendix to his brief, "documents attached as appendices to briefs do not constitute part of the record of the case and cannot be considered by this Court on appeal." *Garcia v. Sasson*, 516 S.W.3d 585, 591 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

nonparent shall exchange the child. Neither parent is to get out of their car for the exchange."[2]

"A judgment must be sufficiently definite and certain to define and protect the rights of all litigants, or it should provide a definite means of ascertaining such rights, to the end that ministerial officers can carry the judgment into execution without ascertainment of facts not therein stated." *Stewart v. USA Custom Paint & Body Shop, Inc.*, 870 S.W.2d 18, 20 (Tex. 1994). The protective order's lifetime prohibition of contact with C.L. effectively terminates Lewis's rights with respect to his possession of and access to C.L. while simultaneously providing for his possession of and access to C.L. We conclude that the protective order contains internally conflicting provisions such that ministerial officers could not execute it "without ascertainment of facts not therein stated." *Id.* Accordingly, we sustain Lewis's fourth issue to the extent that we conclude the trial court erred by issuing an order prohibiting Lewis from being within 400 feet of C.L. and also providing for his possession of and access to C.L. without indicating how those provisions should be reconciled. *See Copeland v. Copeland*, No. 05-18-01431-CV, 2020 WL 4047969, at *8 (Tex. App.—Dallas July 20, 2020, no pet.) (mem. op.) (concluding

---

[2] Lewis also complains that the provisions of the protective order conflict with provisions of the standard possession order issued by the 311th district court. As previously noted, the order of the 311th district court is not part of the record and, therefore, cannot be considered by this Court. *See id.*

20

that protective order that prohibited father from communicating with or being within 500 feet of children, defined as "protected persons" in order, but that also provided for father's supervised possession of or access to the children, contained internally conflicting provisions).

## Conclusion

We reverse the portions of the trial court's order that extend the effective period of the order beyond two years and that prohibit Lewis from being within 400 feet of C.L. but also provide for Lewis's possession of and access to C.L. and remand this case to the trial court for further proceedings consistent with this opinion. In all other respects, we affirm the trial court's order.

Russell Lloyd
Justice

Panel consists of Chief Justice Radack and Justices Lloyd and Countiss.