# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00667-CV

---

**Joseph Richard Rozsa, Appellant**

**v.**

**State of Texas for the Protection of Jaime Danilo Pesantes, Appellee**

---

### FROM THE COUNTY COURT AT LAW NO. 4 OF TRAVIS COUNTY
### NO. C-1-CV-24-004511, THE HONORABLE MICHAEL DENTON, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

The trial court issued a protective order barring Joseph Richard Rozsa from communicating with Jaime Danilo Pesantes and his family for ten years. Rozsa contends that the court lacked jurisdiction, that the county attorney lacked authority to represent Pesantes, that the trial court denied him due process, and that the evidence is insufficient to support the finding of stalking required to support the protective order. We will affirm the judgment.

## BACKGROUND

Pesantes and his sister were the only witnesses who testified at the protective-order hearing. Rozsa represented himself and made assertions while cross-examining witnesses but was never sworn as a witness.

Pesantes testified that he is a criminal-defense attorney who does not practice appellate law. He was looking for office space when his paralegal, Aura Valdez-Payan,

repeatedly told him that Rozsa, her fiancé,[1] had an unused office in Austin that Pesantes could use. Pesantes testified that he did not pay rent and that he used the office three or four hours a week. Pesantes testified that he spoke with Rozsa a few times in passing, that Rozsa never worked for him, and that Pesantes never had Rozsa as a client. Pesantes said that he used the office from 2022 to October 2023, when he fired Valdez-Payan.

Pesantes testified that he did not hear of or from Rozsa again until July 11, 2024, when Pesantes received a notice from the Eighth Court of Appeals that alerted him that Pesantes was counsel of record for Rozsa and Rozsa's company in an appeal that Pesantes knew nothing about. Pesantes testified that the email from the Eighth Court was later deleted from his inbox, which led him to believe that Valdez-Payan still had access to his account. She messaged him the next day stating that she had made a mistake one time using his name with the Eighth Court.

Pesantes testified that the Eighth Court on July 12, 2024, told him that multiple documents had been filed in the case using his state bar license number. Pesantes said that he had not filed any case with the Eighth Court. He said that the pleadings filed by Valdez-Payan listed a phone number, which Rozsa asserted at the hearing was for his business; Pesantes did not recognize the number, but Pesantes's sister testified that when she called the number its outgoing message purported to be from Pesantes's law firm. Pesantes testified that he contacted opposing counsel in the appeal, who told him Rozsa had harassed opposing counsel and other attorneys as well. Pesantes said that, after learning that Valdez-Payan had lied about the number of filings she had made, he did not want to keep communicating with her or Rozsa.

Pesantes testified that, after receiving a copy of his motion to withdraw from the Eighth Court, Rozsa began contacting him on July 14, 2024, in response to the motion to

---

[1] Rozsa denied being engaged to Valdez-Payan, but Pesantes testified "fiancé" was Valdez-Payan's term.

withdraw. Pesantes said the first message he received from Rozsa was a text message in which Rozsa admitted he had used Pesantes's name and bar card without permission. In the message, Rozsa said that he had wanted to hire Pesantes but hired another lawyer who then disappeared. When a deadline loomed, he asked Valdez-Payan to use Pesantes's information to "buy time and then follow up" afterwards. Rozsa said he was wrong to use the information without talking to Pesantes first and that he could remove Pesantes from the case because Rozsa should not have involved him without asking. Pesantes said he did not respond on the advice of law enforcement. Rozsa texted again on July 24, 2024, asking to talk.

Pesantes testified that Rozsa started sending threatening and insulting text messages "saying he would end my career, calling me a coward, saying if he doesn't talk to me he'll go and find and talk to my family. Specifically, my sister who lives in Atlanta." The court admitted text messages from four phone numbers that Pesantes testified were from Rozsa. On the phone Pesantes recognized as Rozsa's, these further messages arrived:

- July 27, 2:38 p.m.  "Answer your phone, coward."

- July 27, 3:55 p.m.  "Calling your sister, since you're obvious not man enough to talk to me on the." (The message was not complete in the exhibit.)

- July 28, 9:04 p.m.  "Coward. I guess you didn't talk to me before submitting false accusations, lies, your own general technological ignorance and otherwise incompetence in a court filing, I don't really need to talk to you before submitting mountains of evidence, documentation and communications from you showing actual fraud, deception and your incompetence to the state bar. Considering your past strikes against you, I would think you'd be man enough to talk to me first. I don't feel bad, as I'm protecting the public from getting stuck with a shitty attorney like you."

- July 29, 2:14 p.m.  "Coward."

Another series of messages arrived from a different number. On July 26, 2024, at 10:56 a.m., Pesantes received this text: "Too big of a coward to respond to texts, let alone answer the phone

3

or meet in person like an adult, eh?  If you're not man enough to talk to me, maybe your sister should call me."  Pesantes responded, writing, "I'm not sure who this is[.]  I've tried calling this number multiple times[.]   [T]his is the first message I'm getting from this number."  Rozsa replied,

> It's my Google Voice number because it seems you seem to have cowardly blocked my cell phone number which I called you on, texted you, left you voice mails.  It really says a lot about you if you go out of your way to fuck over SO many people that help you and do nice things for you without ever getting so much as a thank you in return, that you actually get them confused in your head?  You're a disgrace.

At 2:57 p.m., Rozsa wrote, "Still too much of a coward to address this, eh?  You called opposing counsel, but you're too much of a coward to talk to me?  Got it. After all I did for you . . . ."  On July 27, at 9:12 a.m., Rozsa wrote, "Still not man enough to be a grown-up and have a conversation, eh coward?"  At 7:41 a.m. on July 29,  Rozsa wrote, "Coward."

Additional messages arrived from two other numbers that Pesantes testified that he did not recognize, but believed were from Rozsa.  One on July 27 accused Pesantes of having his sister submit a fake Google review, which the text writer asserted was intentionally misleading, unethical for an attorney, and clearly against Google's terms of service; the writer asserted that the violation had been reported to Google's compliance department.  The next day, another text mocked Pesantes's manliness because he needed help to jump a dead battery and because Pesantes's personal relationship had ended.  A message from a fourth number on July 27 stated, "I can see that your sister read my message, but I guess being a coward must run in the Pesantes family.  Does anyone in your family have any accountability for their actions?"

4

Pesantes testified that he also received phone calls during this period. While he was at a baby shower on Saturday, July 27, 2024, he received 30 to 40 calls in an hour between text messages. He testified that he had received over 100 phone calls from Rozsa and that his sister started to receive phone calls. He and his family were "pretty apprehensive and fearful" because Valdez-Payan had access to his information and knew where he lived, what kind of car he drove, where he went, what he did, and where he shopped. She also had contact information for his parents, his sister, and his brother-in-law. Pesantes went to Atlanta.

The court admitted a list of phone calls to Pesantes over Rozsa's objection that the calls were generated by an auto-dialer, that nobody actually dialed the phone, and that Pesantes could have interrupted the repeated calls by simply answering the phone. Pesantes testified that the auto-dialer's repeat-call parameters are set up by the user. He said that these calls were "not a standard business communication in any way." Pesantes said that Rozsa's behavior showed that "[t]hey believe that they are above the law and that's why I felt so scared. Because I don't know what limit or, you know, their behavior or actions could have." He said he thought the number of non-answers would have shown Rozsa that he did not want to communicate.

Meanwhile, Rozsa also sent texts to Pesantes's sister and left this voicemail on her company's line on Sunday, July 28, 2024, (transcribed by the company's system) about his attempts to reach her:

> [S]he does not seem to be answering her personal lines. But I will try to do the business line tomorrow. It is very important that we reach her. There is a legal matter in Texas that we are trying to address this situation. With, and it is very important that we contact her immediately.

Pesantes filed a suit for a protective order that was served on Rozsa on or about August 1, 2024. Pesantes testified that he continued to receive phone calls and text messages from Rozsa. The contact stopped after Rozsa was served with a temporary protective order.

5

Pesantes passed the first protective-order hearing because he wanted his sister to testify, and she was not in Austin. Rozsa was at that hearing. Pesantes nonsuited his application for a permanent protective order on August 21, 2024, in open court because he said he had decided he should not represent himself. He said that Rozsa, standing a few feet away, chuckled and whispered, "I knew you were a coward. I knew you wouldn't go along with this. I'm going to get you." He said that Travis County prosecutors in the courtroom might have heard Rozsa.

Rozsa on August 21, 2024, sent a letter demanding that Pesantes pay him $15,600 because Rozsa had to come to court twice and had lost business opportunities while in court.

That same day, Pesantes asked the Travis County Attorney's Office to seek a protective order. The State obtained an ex parte temporary protective order that ordered Rozsa "not to communicate with Applicant in any manner whatsoever except through attorneys." The temporary order was served on Rozsa on August 22, 2024. Rozsa nevertheless sent by email an "invoice reminder" for $15,600 on both August 23 and 29, 2024. Pesantes testified that he also received invoices on August 25 and 26, 2024. Rozsa objected that the invoices were from Square, not directly from him.

Pesantes testified at the September 25, 2024 hearing that the last time he heard from Rozsa was the August 29 invoice. Pesantes testified that he was concerned that, in the absence of a protective order, Rozsa would continue to contact him and his family. Pesantes cited the number of calls to him and to his sister at her business. He said that his sister's employers were concerned for her safety because of Rozsa's calls to their office. He said that Rozsa knew his and his sister's home and office addresses even though he and his sister have different last names and he had never given Rozsa his sister's information. He described Rozsa's

behavior as unpredictable, erratic, and dangerous. He also noted that the temporary ex parte protective order did not stop Rozsa's conduct.

On cross-examination, Pesantes testified that he had not experienced aggression from Rozsa before the harassing messages started. He testified that the threats Rozsa made were to report him to Google for unethical behavior and to the State Bar of Texas to get him disbarred and end his career.

Pesantes's sister testified that she had not seen Rozsa until the protective-order hearings and not heard from him until she began receiving text messages and phone calls in July 2024. She said she was terrified and did not respond because she did not want to acknowledge her phone number to this unknown sender. She said that because of Rozsa's messages to her workplace, coworkers were "asking what was going on and just wondering what I was involved with." She testified that Rozsa connected to her on LinkedIn, Facebook, and Instagram. She said she never gave Rozsa her phone number, so the contacts were terrifying because she wondered what other information about her family was online. She said that she did not know what else Rozsa was capable of and that she feared for her children.

Rozsa did not testify or call witnesses. He offered exhibits that were excluded based on the State's objections.

The trial court issued the protective order. It found reasonable grounds to believe that Pesantes was a victim of stalking and ordered Rozsa not to communicate with him or his specified family members in any manner other than through attorneys for ten years.

7

**DISCUSSION**

Rozsa challenges the court's subject-matter jurisdiction, the county attorney's authority to represent Pesantes, the trial court's denial of due process, and the sufficiency of the evidence.

## I. The trial court had subject-matter jurisdiction over this case.

Rozsa contends that the trial court lacked jurisdiction because it was designated as a family-violence court and there was no allegation of a familial relationship. We review de novo a challenge to the trial court's subject-matter jurisdiction. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004). Rozsa contends that the family-violence-court designation means that the trial court hears Family Code issues and "raises questions about [the trial court's] authority over *non-family violence* protective orders brought under the *Code of Criminal Procedure*." (Italics in original.) He cites no authority supporting the proposition that the affirmative authorization for a specific court to hear a category of cases implicitly limits that court's jurisdiction in other areas statutorily granted to that type of court.

The trial court had jurisdiction over this case. The order was issued by Travis County Court at Law Number 4, a statutorily created county court at law. *See* Tex. Gov't Code § 25.2291(a)(4). County courts at law have jurisdiction over all civil causes and proceedings prescribed by law for county courts. *Id.* § 25.003(a). An application for a protective order—including for stalking—may be filed in an appropriate statutory county court. Tex. Code Crim. Proc. art. 7B.001(b)(1). Protective orders under article 7B.001 may be issued without regard to a familial relationship between the applicant and the alleged offender. *Id.* art. 7B.001(a). Travis County Court at Law Number 4 is statutorily required to "give preference to cases in which

8

family violence is alleged, including cases under Title 4, Family Code." *See* Tex. Gov't Code § 25.2292(c). The Travis County local rules state, "Court 4 will hear primarily cases involving offenses against a person whose relationship to or association with the defendant is described by Section 71.0021(b), Section 71.003, or Section 71.005 of the Family Code." *See Local R. of Proc. and R. of Decorum for the Cnty. Courts at Law of Travis County, Tex.* (Ch. 1.4, p. 2, Adopted November 15, 2022). Nothing in these statutes or local rules, including their requirement that family-violence cases get preference, stripped Travis County Court at Law Number 4 of jurisdiction or prohibited it from considering an application for a non-family-law-related protective order.

We overrule Rozsa's challenge to the trial court's subject-matter jurisdiction.

## II. The Travis County Attorney's Office had the authority to pursue the protective order on Pesantes's behalf.

Rozsa contends that the protective-order statute does not expressly authorize the county attorney[2] to "represent" a private applicant seeking a protective order unless the allegedly threatening person has a conviction or deferred adjudication for listed offenses, in which case the county attorney must apply for a protective order. *See* Tex. Code Crim. Proc. art. 7B.001(a) (seeking order without conviction), (a-1) (post-conviction filing). He contrasts the lack of express authorization of the county attorney to seek pre-conviction protective orders under the Code of Criminal Procedure with the Family Code's express authorization for a county attorney to seek a protective order under that statute. *Compare id.*, *with* Tex. Fam. Code § 81.007. He contends

---

[2] We will use the term "county attorney" to include all attorneys in the Travis County Attorney's Office who represented the State for the protection of Jaime Danilo Pesantes.

9

that the county attorney's representation of Pesantes was unauthorized and harmful by having the State unduly influence the court and prejudicing Rozsa's defense against the application.

The county attorney had the authority to pursue this protective order. A county attorney is a "prosecuting attorney." *See* Tex. Gov't Code § 41.101. The Code of Criminal Procedure provides:

> The following persons may file an application for a protective order under this subchapter without regard to the relationship between the applicant and the alleged offender: (1) A person who is the victim of an offense under . . . [§] 42.072 . . . Penal Code . . . or (3) a prosecuting attorney acting on behalf of a person described by Subdivision (1) or (2).

Tex. Code Crim. Proc. art. 7B.001(a). Penal Code Section 42.072 criminalizes stalking. The applicant need not have a conviction in hand to obtain a protective order; the applicant need prove only that "there are reasonable grounds to believe that the applicant is the victim of stalking." *Id.* art. 7B.003; *see Yeung v. Yeung*, No. 01-21-00124-CV, 2023 WL 17537, at *1, n.1, *3-4 (Tex. App.—Houston [1st Dist.] Jan. 3, 2023, no pet.) (mem. op.). The county attorney, as a prosecuting attorney, has authority to seek a protective order on behalf of persons for whom there are reasonable grounds to believe are the victims of stalking. *See Sabatino v. Goldstein*, 649 S.W.3d 841, 845-46 (Tex. App.—Houston [1st Dist.] 2022) (interpreting Code of Criminal Procedure chapter 7A, statutory predecessor to chapter 7B), *aff'd on other grounds*, 690 S.W.3d 287 (Tex. 2024).

We conclude that the Travis County Attorney's Office had the authority to pursue the application for protective order on Pesantes's behalf.

**III.    Legally and factually sufficient evidence support issuance of the protective order.**

Rozsa contends that the protective order is not supported by legally and factually sufficient evidence.

**A.    The applicable legal standards.**

Under the Code of Criminal Procedure, a person who is the victim of stalking can apply for a protective order.  Tex. Code Crim. Proc. Art. 7B.01(a)(1).  Stalking is a criminal offense under the Penal Code:

> A person commits an offense if the person, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that:
>     (1) constitutes an offense under Section 42.07 [harassment], . . .;
>     (2) causes the other person . . . to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and
>     (3) would cause a reasonable person to:
>         . . .
>         (D) feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended.

Tex. Penal Code § 42.072(a).  A person commits the offense of harassment:

> if, with the intent to harass, annoy, alarm, abuse, torment, or embarrass another, the person:
>     (1) initiates communication and in the course of the communication makes a comment, request, suggestion, or proposal that is obscene;
>     (2) threatens, in a manner reasonably likely to alarm the person receiving the threat, to inflict bodily injury on the person or to commit a felony against the person, a member of the person's family or household, or the person's property;
>         . . .
>     (4) causes the telephone of another to ring repeatedly or makes repeated telephone communications anonymously or in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another;
>         . . .

11

> (7) sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another . . . .

Tex. Penal Code § 42.07(a).

A trial court *must* grant a protective order if it determines that there are reasonable grounds to believe that the applicant was the victim of stalking. Tex. Code Crim. Proc. art. 7B.003(b); *Caldwell v. State for Zimmerman*, No. 03-22-00464-CV, 2024 WL 3906789, at *11 (Tex. App.—Austin Aug. 23, 2024, pet. denied) (mem. op.). We review a trial court's decision to grant or deny a protective order under chapter 7B of the Texas Code of Criminal Procedure for legal and factual sufficiency of the evidence. *State for Prot. of P.B. v. V.T.*, 575 S.W.3d 921, 924 (Tex. App.—Austin 2019, no pet.). The preponderance of the evidence must support finding that there are reasonable grounds to believe that the applicant is the victim of stalking before the trial court can issue a protective order. *Webb v. Schlagal*, 530 S.W.3d 793, 803 (Tex. App.—Eastland 2017, pet. denied); *Caldwell*, 2024 WL 3906789, at *11.

When addressing a legal sufficiency challenge, we consider the evidence presented below in the light most favorable to the trial court's judgment. *Pediatrics Cool Care v. Thompson*, 649 S.W.3d 152, 161 (Tex. 2022). We evaluate whether the evidence presented is such that "reasonable and fair-minded people" could reach the same decision as the trial court. *Id.*; *see Boyd v. Palmore*, 425 S.W.3d 425, 429 (Tex. App.—Houston [1st Dist.] 2011, no pet.). To sustain a legal-sufficiency challenge, we must find that (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove

12

a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).

"A party attacking the factual sufficiency of a finding on appeal must 'demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence.'" *Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 733 (Tex. 2020) (per curiam) (quoting *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam)). "In reviewing a factual sufficiency point, the court of appeals must weigh *all* of the evidence in the record." *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam). We will set aside the trial court's judgment "only if the evidence is so weak, or the finding is so against the great weight and preponderance of the evidence, that it is clearly wrong and unjust." *Boyd*, 425 S.W.3d at 429.

In an appeal from a bench trial, we defer to the trial court's credibility determinations. *S-G Owners Ass'n, Inc. v. Sifuentes*, 562 S.W.3d 614, 620 (Tex. App.—Houston [1st Dist.] 2018, no pet.). As factfinder, the trial court is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *Scott v. Wooley*, No. 02-19-00318-CV, 2020 WL 7063292, at *4 (Tex. App.—Fort Worth Dec. 3, 2020, no pet.) (mem. op.).

As set out above, the evidence showed that Rozsa made repeated phone calls and sent repeated text messages from multiple phone numbers targeting Pesantes and Pesantes's sister, who had no direct link to Rozsa or his building, his business, or legal proceedings. Rozsa rang Pesantes's phone more than 40 times in an hour and more than 100 times over a long weekend. He also contacted the sister's business and left messages that caused coworkers to inquire what she was involved in. There was evidence that Rozsa (through his

13

girlfriend/fiancée/Pesantes's former paralegal) had used Rozsa's phone number on the appellate court documents and recorded an outgoing message saying that the number was for Pesantes's law firm. Both Pesantes and his sister testified that the repeated contact attempts made them fearful; Pesantes left Austin temporarily. The court concluded that, even without threats of physical violence, this evidence showed harassment that satisfied the definition of stalking.

We conclude that legally and factually sufficient evidence supports the finding of harassment. Rozsa's assertion that his phone's auto-dialer did the repeated dialing is unavailing because he "caused" Pesantes's telephone to ring repeatedly by using the auto-dialer. The recipients' refusal to answer calls and messages is not a statutorily defined excuse for Rozsa's conduct. The evidence supported a finding that such contact satisfied the statutory requirements that it harassed, annoyed, or alarmed Pesantes and his sister, and that a reasonable person would feel the same. *See* Tex. Penal Code §§ 42.07(a)(4), (7); 42.072.

## IV. Rozsa has not shown that he was denied due process.

Rozsa complains that the trial court deprived him of due process by failing to rule on his motion to dismiss; relying on false, conclusory, or improper statements by the county attorney; and by failing to hold the State to the proper evidentiary standards.

### A. The court did not err by failing to rule on his motion to dismiss.

Rozsa points to no authority that the trial court must expressly deny every motion. Motions can be denied implicitly. *See* Tex. R. App. P. 33.1 (preservation of error shown if "the trial court (A) ruled on the request, objection, or motion either expressly **or implicitly**" (emphasis added)). Rozsa filed his motion to dismiss as part of his answer and brought it to the trial court's attention at the beginning of the hearing on the application for protective order. In

14

this case, the trial court's choices to proceed with the hearing and to grant the protective order implicitly denied Rozsa's motion to dismiss the application. Further, the grounds raised for dismissal were not erroneously ignored or denied. He raised five grounds for dismissal:

2.[3] The allegations in the Application do not meet the legal criteria for a protective order under Texas law.

3. The dispute at hand is entirely professional in nature and should be addressed through other legal channels, not through a frivolous protective order proceeding.

4. There is no clear and present danger that would justify the issuance of a protective order.

5. The Application deliberately and knowingly mischaracterizes the nature of communications between the parties in a clear and intentional attempt to mislead the Court and abuse the legal process.

6. The Application improperly references an unrelated case, which is pending before the 8th Court of Appeals, with numerous conclusory statements and is completely irrelevant to this proceeding and risks prejudicing both this Court and the Appellate Court.

These issues relate to the merits of the application. The trial court held a hearing; took evidence; and assessed the nature of the dispute, the statutory elements for issuing a protective order, the county attorney's characterizations, and the relevance of the references to the Eighth Court proceeding. The proceeding in the Eighth Court is relevant because the message from the Eighth Court alerted Pesantes to the unauthorized use of his credentials which eventually led to the Protective Order that we have determined was supported by legally and factually sufficient evidence.

---

[3] The numbers for the paragraphs are from the paragraph numbering in Rozsa's answer, not just the section devoted to dismissal. Paragraph number 1 was the introductory paragraph for the answer as a whole.

15

Rozsa has not shown that the absence of an express ruling denying his motion to dismiss was error that harmed him.

**B.** **Rozsa did not show that the trial court improperly relied on false, conclusory, or improper statements by the county attorney.**

1. <u>False statements</u>. Rozsa contends that the county attorney "made false representations regarding Appellant's prior protective order history and criminal background. Reliance on such false information presented by an officer of the court violates due process. These statements likely prejudiced the court's view of Appellant's credibility and propensity for threatening behavior."

Appellants must show that they preserved error by complaining to the trial court by a timely request, objection, or motion that stated the grounds for the ruling the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint and that the trial court ruled on the request. *See* Tex. R. App. P. 33.1(a). They must also make appropriate citations to the record in their appellate brief. *See id*. R. 38.1(i); *see also ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010) ("The Texas Rules of Appellate Procedure require adequate briefing."). Although we liberally construe pro se briefs, litigants who represent themselves are held to the same standards as litigants represented by counsel. *See Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 184–85 (Tex. 1978). To hold otherwise would give pro se litigants "an unfair advantage over litigants represented by counsel." *Id.* at 185.

In his argument on this issue, Rozsa did not recite the statements that were false or cite to places in the record where those statements purportedly occurred. Because Rozsa's arguments do not include citations to the record, he has waived his issues due to inadequate

16

briefing. *See* Tex. R. App. P. 38.1(i); *see also Hollis v. Acclaim Physician Grp., Inc.*, No. 02-19-00062-CV, 2019 WL 3334617, at *3, (Tex. App.—Fort Worth July 25, 2019, no pet.) (mem. op.) ("In the absence of appropriate record citations or a substantive analysis, a brief does not present an adequate appellate issue."). Further, we have determined that sufficient evidence supports the protective order without regard to any allegedly false statements made by the county attorney.

2. <u>Conclusory statements</u>. Rozsa contends that the court relied on conclusory statements rather than specific evidence meeting the elements; he asserted that "[c]onclusory statements ('Appellant is harassing Applicant') are not evidence and cannot support the required findings." We have examined the evidence and found it legally and factually sufficient to support the Protective Order without regard to any allegedly conclusory statements made by the county attorney.

3. <u>Irrelevance</u>. Rozsa contends that the county attorney "introduced, and the court apparently considered, information regarding a separate civil appeal before the Eighth Court of Appeals." Again, Rozsa does not provide any citation or reasoning for his bare assertion that the trial court considered the existence of the other civil appeal in any way that was improper and error harmful to Rozsa. Rozsa argues that the "severity" of the county attorney's conduct and the cumulative effect of the trial court's errors show a lack of impartiality that combined to show harm that probably led to the finding of stalking and the imposition of the lengthy protective order.

To the contrary, Rozsa has demonstrated no errors by the trial court. *See Caro v. Sharp*, No. 03-02-00108-CV, 2003 WL 21354602, at *8 (Tex. App.—Austin June 12, 2003, pet. denied) (mem. op.) ("[W]hen there are no errors we reject cumulative error issues."). Some

evidence of the proceeding in the Eighth Court was unsurprising given its role as a precipitating event here, but the facts and nature of that dispute played no discernible role in the trial court's decision and is not a factor in our conclusion that the evidence was sufficient to support the Protective Order.  We find no cumulation of errors, acts, omissions, or other circumstances that support reversal.

## CONCLUSION

We affirm the Protective Order.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Affirmed

Filed:   August 7, 2025